UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO.:  05 CV 40071-FDS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*)
CHRISTIAN SCHWENK,             )
        Plaintiff        )
                                )
v.                              )
                                )
AUBURN SPORTSPLEX, LLC, DENNIS  )
NATOLI, JOHN NATOLI, and PETER  )
NATOLI,                         )
        Defendants        )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF, CHRISTIAN SCHWENK'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

1. A Certificate of Organization establishing the Auburn Sportsplex LLC was filed with the Ma Secretary of State's Office on July 12, 2002.  Complaint and Answer #14.

2. Peter Natoli is the sole manager of the Sportsplex according to documents filed with the Commonwealth of Massachusetts.  Complaint and Answer #15.

3. On or about December 12, 2002, the Sportsplex obtained a loan in the amount of $950,000 from NBSB.  Each of the individual named Defendants are personally obligated for this loan. Complaint and Answer #21, 22.

4. The documents attendant to the NBSB loan agreement called for the Sportsplex to maintain its principal operating account with NBSB. John Natoli depo. p. 75.

5. The Sportsplex maintained its principal operating account at Sovereign Bank. John Natoli depo p. 75-6.

6. Defendants were aware of the fact that the Plaintiff had been in a serious car accident in Florida, that Plaintiff had brought suit for personal injuries

      suffered in said accident, and that Plaintiff expected to receive funds. Peter Natoli depo p. 11, 14; John Natoli depo p. 122.

7. Defendant Peter Natoli was aware of the fact that the Plaintiff had suffered financial setbacks from time to time. Peter Natoli depo p. 11

8. On about June 21 or 22, 2003, Defendant, John Natoli sent several documents concerning the Sportsplex from Massachusetts to Plaintiff's residence in Florida. John Natoli depo p. 118

9. Included among the documents was a letter on Sportsplex letterhead signed by Defendant John Natoli (Exhibit A to the Complaint)

10. Included among the documents was an Ownership Purchase Agreement that was drafted by Defendant John Natoli. John Natoli depo. p. 121.

11. Plaintiff received a large settlement from the law suit related to the aforementioned car accident. Plaintiff's answer to interrogatory Number 8 (April 25, 2006).

12. On or about July 21, 2003, Plaintiff arranged for the wire transfer of $100,000 from his bank account to the Sportplex Sovereign Bank account. Complaint and Answer #29.

13. On or about July 30, 2003, the individual named Defendants held a meeting at which, among other things, Defendant John Natoli presented an employment agreement for approval. Complaint and Answer #31 and Exhibit B to Complaint.

14. At the time of the July 30, 2003 meeting, there were at least two other individuals that held minority ownership interests in the Sportsplex. John Natoli depo p. 138

15. Plaintiff was not aware of the existence of a meeting of July 30, 2003, nor of the existence of an employment agreement. Plaintiff answer to Defendant's Interrogatories #2 (June 10, 2006)

16. At the July 30, 2003 meeting, the individual Defendants unanimously agreed to approve the employment agreement presented by John Natoli. Complaint and Answer #34.

17. Plaintiff sent, and Defendants received, a letter dated April 16, 2004 (copy appended hereto) asking for, among other things, information regarding the operation of the Sportsplex. Complaint and Answer #39.

18. Plaintiff sent, through counsel, and Defendant Peter Natoli received a letter dated August 19, 2004 (copy appended hereto) requesting access to pertinent business documentation concerning the operation and financial condition of the Sportsplex. Among the bases for the request named in the letter was MGL chap. 156c. Complaint and Answer #40.

19. Plaintiff, sent through counsel, and Defendants John Natoli and Peter Natoli received a letter dated December 9, 2004 (copy appended hereto) under MGL c. 93A. Said Defendants failed to provide a written response to the December 9, 2004 demand letter. Complaint and Answer #42, 43.

20. Plaintiff brought suit in this court on May 11, 2005 initially seeking, among other things, copies of ordinary business records pursuant to MGL c. 156c. Pleadings.

21. Since it began operations, the Sportsplex has generated significant revenue upon the receipt of fees paid for the use of the Sportsplex facilities. Complaint and Answer #78.

22. The Sportsplex shares common ownership with One St. Mark Street Realty Trust. John Natoli depo. p. 39, 40.

23. The Sportsplex has had serious and ongoing deficiencies in, among other things, the maintenance of normal business records. John Natoli depo p. 54, 57, 58, 63, 83, 109-112

24. One St. Mark Street Realty Trust, and Peter Natoli and Dennis Natoli are defendants in a separate lawsuit pending in Worcester Probate and Family Court (Department of the Trial Court). Copy of Complaint C.A. No. 03E0083GCI

## STANDARD FOR SUMMARY JUDGMENT

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Unless the moving party carries its burden of showing, based upon the pleadings, depositions, answers to interrogatories and affidavits, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (Fed.R.Civ.P. 56(c)), then an order for summary judgment should not issue. Defendants claim that the terms of the Ownership Purchase Agreement ("the Agreement") (Exhibit B, Defendant's Motion) provide that the parties intended the effective date of the Agreement to be June 23, 2003. Based on that theory, the Defendants contend that there are no material facts at issue and that, as a matter of law, summary judgment should be issued on their behalf in connection with Count II (breach of contract claim) of Plaintiff's First Amended Complaint.

Plaintiff submits that Defendants' position is unsupportable since it ignores the inherent ambiguity of the Agreement that Defendant, John Natoli, drafted; and relevant case law calls into question the entire point of Defendants' contention. As such, Plaintiff respectfully submits that the Defendants' Motion be denied.

## THE AGREEMENT IS REPLETE WITH AMBIGUOUS LANGUAGE AND SUMMARY JUDGMENT CANNOT BE SUSTAINED:

The basis of the Defendants' argument is that the effective date of the Agreement was June 23, 2003, thus requiring the Plaintiff to invoke the refund provision (paragraph c, Exhibit "A" to the Agreement) by June 23, 2004.  As more fully detailed below, the Agreement is rife with ambiguity.  Thus, critical issues of material fact that go to the core of Plaintiff's breach of contract claim in Count II must be resolved so that it can be determined whether June 23, 2003, August 20, 2003 or some other date triggered the refund provision.  As such, this matter is not ripe for summary judgment and Defendant's Motion must be denied.

In their Memorandum in support of their Motion, Defendants cite Suffolk Construction Co., Inc. v. Lanco Scaffolding Co., Inc. 47 Mass. App. Ct. 726, 716 N.E. 2d 130 (1999) for the proposition that "[w]here the wording of an agreement is unambiguous, it must be enforced according to its express terms." Def. Memo at p. 5.  Defendants cite Suffolk Construction once again in claiming that "the phrases 'made and entered' or 'made and executed,' when appearing in a contract, indicate its effective date." Def. Memo at p. 6.  Upon closer examination, however, the underlying facts in Suffolk Construction are clearly distinguishable from those presented in the instant case.

In Suffolk Construction, the Massachusetts Supreme Judicial Court considered whether an agreement between a general contractor and its scaffolding subcontractor should be given retroactive effect.  More particularly, the Court considered whether an indemnification provision in the contract would apply to cover an accident that occurred while the subcontractor was working on the construction project but before the date of the written contract.  As the Court noted, while the general contractor sent its subcontractor a

formal agreement on June 6, 1991, "[i]t states at the top of the first page . . . that it was 'made this 24th day of May, 1991.' Above the signature lines appear the words, 'executed under seal ***as of*** the date first above written.'" (Emphasis supplied). Id., 47 Mass. App. Ct. at 727, 728.   Thus, the Supreme Judicial Court held in Suffolk Construction that

> [W]e discern no ambiguity in the subcontract as to its effective date.  The only date mentioned in the agreement is May 24, 1991, the date it was "made" and "executed under seal."  There are no other dates in the agreement whatever that might create ambiguity or confusion as to a different effective date for the contract.  The ordinary meaning and usage of the words "made" and "executed," considered together, makes plain that the subcontract was produced, created or "made," and signed, put into effect or "executed" on May 24, 1991.  The contract by its terms became effective two days after the accident.

Notwithstanding Defendants' contentions to the contrary, the language of the Agreement before the Court in the present case is most certainly ambiguous.  First, unlike the contract in Suffolk Construction, there are several dates presented in the Agreement.  In fact, upon examination of the Agreement, one can identify 4 separate dates:  the "23 day of june, 2003" [sic] appears on the top line of the document; June 30, 2003 as a closing date has been stricken; July 18, 2003 has been written in and stricken; and Aug. 20, 2003 remains legible.  On its face, these various dates present genuine issues of fact concerning the parties' intent.

In addition, unlike the contract terms at issue in Suffolk Construction in which the language of the signature line ("executed under seal ***as of*** the date first above written") ratifies the date set forth in the opening line of the contract (May 24, 1991), the language of the signature line in the present case ("IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto ***on the*** date first written" – i.e., June 23, 2003) raises issues of fact and witness credibility that are material to Plaintiff's

6

breach of contract claim in Count II of the First Amended Complaint. In sum, there is a critical, material issue of fact that must be resolved: i.e., when did the parties "execute" (sign)[1] the Agreement.

The parties are at odds on when the Agreement was signed. The Plaintiff has consistently stated he signed the Agreement on August 20, 2003. In his answers to interrogatory #5 (Exhibit A to Attorney Ritter's Affidavit of June 22, 2006) and in his deposition, Plaintiff stated that he signed the Agreement on August 20, 2003. Furthermore, at page 2 of a letter dated April 16, 2004 written in hand by the Plaintiff (prior to the commencement of this lawsuit) and received by Defendant Peter Natoli, Plaintiff wrote, in pertinent part, "I wired $100,000.00 into your account on July 21, 2003. I then visited in August and we signed the agreement. . . ." (A copy is attached as Exhibit E to Attorney Ritter's Affidavit.) In short, Plaintiff has presented compelling information in support of his position that the Agreement was signed on August 20, 2003 in central Massachusetts.

The Defendants, on the other hand, present accounts that are confusing and contradictory. In sum, the Defendants have stated as follows:

- Defendant John Natoli testified at his deposition that all three of the individual Defendants signed the Agreement in June, 2003 and that the signing occurred when the Defendants were all in one another's presence. <u>John Natoli depo. p.118-119</u>;

---

[1] Black's Law Dictionary, 8e (West, c2004), pg. 609, defines "executed" as: 1. EXECUTED: executed, adj. 1. (Of a document) that has been signed <an executed will>. "The term 'executed' is a slippery word. Its use is to be avoided except when accompanied by explanation … A contract is frequently said to be executed when the document has been signed, or has been signed, sealed, and delivered. Further, by executed contract is frequently meant one that has been fully performed by both parties." Quoting William R. Anson, <u>Principles of the Law of Contract</u> 26 n.* (Arthur L. Corbin ed., 3d Am. Ed. 1919).

7

- Defendant Peter Natoli testified at his deposition that he signed the Agreement in June, 2003 while at the Sportsplex. He provided confusing and contradictory testimony on when the other individual Defendants signed the Agreement. Peter Natoli depo. p. 68-72; and

- Defendant Dennis Natoli was unable to provide meaningful testimony at his deposition. In lieu thereof, he provided a written statement dated June 22, 2006 in which he admitted that he did not sign the Agreement, rather that John Natoli had Dennis Natoli's permission to affix his signature to the Agreement. (A copy of Defendant Dennis Natoli's written admission is attached hereto).

Based on the foregoing, it is abundantly clear that the Agreement at issue in this case is "ambiguous." See e.g., Lumbermens' Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165 (1995), in which the court noted that a contract is considered to be ambiguous when the language at issue is susceptible to more than one meaning and reasonable people would differ as to which of two or more meanings is the proper one.

Moreover, given the general rule of contract construction that a writing is construed against the author of the doubtful language[2], see e.g., Merrimack Valley National Bank v. Baird, 372 Mass. 721 (1977), Plaintiff's position that the Agreement was effective on August 20, 2003 is a reasonable interpretation; one that, when considered in the overall context of the instant dispute, compels this Court to deny Defendants' Motion for Summary Judgment on Count II.

---

[2] At his deposition, Defendant John Natoli stated that he used a form he had obtained from a Staples store in order to generate the Ownership Purchase Agreement, so as not to be "overly technical" (J. Natoli deposition at p. 121).

COUNT V - CHAPTER 93A CLAIM

Defendants ask this Court for an order granting summary judgment as to Count V claiming that: (1) disputes between parties in the same venture do not fall within the purview of 93A, §11; (2)"Chapter 93A is applicable only to business dealings, "'between discrete, independent business entities,'" ; (3) "[t]rans- actions involving or affecting stakeholders of a particular business or in the same venture, but not affecting the general public or other businesses are private, nonbusiness transactions and not in 'trade or commerce' as required by MGL ch. 93A"; and (4) "the claims alleged in Plaintiff's First Amended Complaint describe a private grievance between a minority stockholder and Sportsplex's other owners which is not subject to the provisions of c. 93A." [pages 7-8].

Contrary to Defendants' assertions, and as more fully detailed below, the factual claims of misrepresentation and failure to disclose material facts that are at the heart of Count V of Plaintiff's First Amended Complaint are precisely the type of misdeeds that are: (a) prohibited by MGL c. 93A; (b) identified by the Massachusetts Attorney General as violating 93A; and (c) held by this Court (and others) to be actionable under 93A §§ 2, 11.

**A. <u>Count V of Plaintiff's Amended Complaint Falls Squarely within the Statutory Provisions of MGL c. 93A:</u>**

The dispute at issue in the instant case began with the Defendants' offer to sell Plaintiff an ownership interest in the Auburn Sportsplex, a business established and managed by the Defendants. See Exhibits and to Plaintiff's First Amended Complaint.

As the Defendants have noted in the Memorandum in support of their Motion (p. 7), "Defendant Peter Natoli contacted the Plaintiff to tell him about an indoor sports facility that was being built, namely the Auburn Sportsplex." Soon thereafter, Defendant

9

John Natoli sent a package of documentation to Plaintiff's residence in Florida. Among the documents were:

- A one page letter with the date of June 23, 2003 affixed (copy attached to Plaintiff's First Amended Complaint as Exhibit A) in which Defendant John Natoli explained the Sportsplex, stated projected rates of return (18-30%) and made other claims;
- Projected cash flow statements for the Sportsplex;
- Various pictures of facilities like the Sportsplex; and
- An Ownership Purchase Agreement (copy attached to Plaintiff's First Amended Complaint as Exhibit D) which, among other things, stated that Defendants would sell Plaintiff a 5% interest in the Sportsplex in exchange for the payment of $100,000.

Generally, Section 2 of MGL, c. 93A prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce." MGL, c. 93A, §1 defines "trade or commerce" to include the offering for sale or the sale of any "security" as defined in Chapter 93A §1(k). "Security" means, among other things, any note; stock; investment contract; certificate of interest or participation in any profit-sharing agreement; any instrument of interest commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[3]

---

[3] The statutory language of MGL Chapter 93A governing securities closely approximates the statutory language of the federal Securities Act of 1933 as interpreted by the U.S. Supreme Court in SEC v. Howey Co., 328 U.S. 293 (1946). In Howey, the Court established the time honored test of what constitutes a

Based on the preceding definitions, it is manifestly apparent that the Defendants' offer to sell, and the subsequent sale of a 5% ownership interest to Plaintiff, constitutes acts or practices in the conduct of "trade or commerce" as provided for under Mass Gen L. c. 93A.

B. **<u>Count V of Plaintiff's Amended Complaint Falls Squarely within the Framework of the Regulations Promulgated by the Attorney General:</u>**

Section 2(c)of MGL c. 93A directed the Attorney General to issue regulations consistent with the statutory provisions noted above. These regulations are set forth in 940 CMR 3.16, providing, in part, that an act or practice is a violation of M.G.L. c.93A, §2 if:

1. It is oppressive or otherwise unconscionable in any respect; or
2. Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or
3. It fails to comply with existing statutes rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth . . . intended to provide the consumers of this Commonwealth protection.

The Attorney General's rules and regulations provide guidance and are reflective of the type of acts that fall within the dynamic field of "unfair and deceptive" practices. See <u>Purity Supreme v. Attorney General</u>, 380 Mass. 762, 777-778 (1980). Plaintiff respectfully submits that Defendants engaged in a series of misstatements and/or omissions that fall within the level of rascality that MGL c.93A and the Attorney General's regulations were designed to address.[4] Among these acts or omissions are:

---

security. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." <u>Id</u>., at p. 301.

[4] Chapter 93A is a broad prohibition on unfair and deceptive business practices. See e.g., <u>Medway Auto Sales, Inc. v. Sutton Motor & Sales, Inc.</u>, Superior Court of Massachusetts at Worcester, decided March 25, 2005.

In <u>Speakman v. Allmerica Financial</u>, 367 F.Supp.2d 122 (Dist. MA 2005), this Court stated that "Chapter 93A provides no definition of an 'unfair or deceptive act or practice' (citations omitted). As a

- That the Defendants purchased the land on which the Sportsplex was constructed from One St. Mark Street Realty Trust, an entity in which Defendants Dennis Natoli and Peter Natoli were trustees, and all three individual Defendants were beneficiaries. <u>John Natoli depo. p 39-40.</u>

- That there were a number of questionable financial transactions between the Sportsplex and One St. Mark Street Realty Trust. <u>Peter Natoli depo p. 63-64</u>.

- That the individual Defendants unanimously agreed at a meeting purported to be of all owners of the Sportsplex on July 30, 2003, to approve an employment agreement for Defendant John Natoli. <u>John Natoli depo exhibit 3</u>.

- That Defendants Peter Natoli and Dennis Natoli were named as defendants in a Complaint for Accounting filed on August 29, 2003 in the Worcester Probate and Family Court (No. 03E0083GC1, copy attached); and that said action related to the financial status and business operations of One St. Mark Street Realty Trust.

- That the Defendants failed to provide Plaintiff with access to relevant business records for the Sportsplex, despite Plaintiff's repeated requests<u>. Schwenk depo. exhibit 5</u>.

---

general principle, conduct that comes 'within any recognized common law or statutory concept of unfairness' is actionable under section 11." (citations omitted)

It is respectfully submitted that the failure of the Defendants' to disclose material facts to the Plaintiff at the time they conveyed the offer to sell a 5% interest in the Sportsplex contravened the Attorney General's regulations set forth above.[5]

### C. **Massachusetts State and Federal Courts Have Held Under Analogous Situations that Complained of Acts Fall Squarely within Chapter 93A:**

The legal and factual underpinnings of the instant case are similar to those of In re Curran and LeRoux, 157 B.R. 500, 24 Bankr.Ct. Dec. 850 (U.S. Bktcy Ct., MA) (1993). In Curran, a partnership that had been established to acquire and operate a sports related enterprise (a race track), financed the enterprise in large measure through a substantial bank loan. Subsequently, the partnership solicited additional investors, the proceeds of the unit sales to be used to reduce the partnership's acquisition debt. In reliance on the representations made in the offering materials, the plaintiffs purchased units in the partnership and refrained from exercising their right of rescission provided in the offering documents. Plaintiffs brought suit claiming, among other things, that the offering documents contained false representations of material facts and that the defendants operated the race track in a way that caused plaintiffs substantial financial injury. Curran 157 B.R. 500,504.

As in the instant case, the defendants in Curran claimed that Mass. Gen. L. c 93A, Section 2 and 11 applies only to dealings "between discrete, independent business entities", citing Newton v. Moffie, 13 Mass. App. 462, 467, 434 N.E. 2d 656 (1982). In denying defendants' motion in Curran, the U.S. Bankruptcy Court held that:

> Plaintiffs cannot maintain their claim under Section 93A against the Defendants as to events which occurred while they were partners.

---

[5] In addition to violating MGL Chapter 93A, Plaintiff believes that Defendants' conduct contravenes public policy considerations that are the foundation of, among other statutes, MGL Chapter 156c, Section 38, MGL Chapter 231, Section 85J and MGL Chapter 110A.

13

>However, the facts alleged could sustain the count as to earlier events. Curran 157 B.R. 500, 508 [6]

More recently, in Marram v. Kobrick Offshore Fund (SJC 09161) (June 10, 2004), the Supreme Judicial Court vacated the trial court's decision dismissing claims (including those under Chapter 93A, Section 11) brought by an investor against the manager of a hedge fund. More specifically, the Court held that the lower court erred in dismissing plaintiff's 93A claim both as to defendant's pre-investment and defendant's post-investment statements.

Throughout the course of their dealings with the Plaintiff, Defendants acted in a matter inconsistent with their roles as: (a) member/managers of the Sportsplex, (b) promoters and sellers of securities in the Sportsplex; and (c) friends of longstanding duration with the Plaintiff. Defendants' actions clearly fall within the purview of Mass. Gen. Laws c. 93A, Sections 2(a), 11 and the Attorney General's Regulations promulgated under 93A.[7] As such, Defendants have failed to meet their burden of demonstrating that there is no genuine issue of material fact that would obviate the need for a trial and that Defendants are, as a matter of law, entitled to summary judgment on Count V.

---

[6] It is noteworthy that while the Curran decision was issued in 1993, the confidential offering memorandum for the sale of partnership units and the subsequent supplemental offering documentation involved in that case both occurred in 1986. Thereafter, in 1987, the Massachusetts legislature amended Chapter 93A to make it expressly applicable to certain securities transactions. See Fleming v. National Union Fire Ins. Co., SJC -09415 of Nov. 23, 2005, p, 9, footnote 7.

[7] Section 11 provides for the recovery of damages for "any person who engages in the conduct of any trade or commerce and suffers any loss . . . as the result of the use or employment by another person who engages in any . . . unfair or deceptive act. . . ."

14

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter an order denying Defendants' Motion for Summary Judgment on Counts II and V of Plaintiff's First Amended Complaint.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests that the matters presented herein be heard by this Court through oral arguments presented by counsel and that said hearing be scheduled at the Court's earliest convenience.

                                          Christian B. Schwenk
                                          by his attorney,

*s/ Douglas L. Fox*

Douglas L. Fox, Esq
BBO#:   176380.
Shumway, Giguere & Fox, PC
19 Cedar Street
Worcester, MA  01609
(508) 756-2323

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2006, I served a copy of the within Plaintiff's Memorandum In Opposition To Defendants' Motion For Summary Judgment On Plaintiff's First Amended Complaint by electronic filing upon:

William J. Ritter, Esquire
Pojani Hurley Ritter & Salvidio, LLP
446 Main Street
Worcester, MA 01608

*s/ Douglas L. Fox*
Douglas L. Fox