Complaint

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO.: 05 CV 40071-FDS

```
*********************************)
CHRISTIAN SCHWENK,              )
                  Plaintiff     )
                                )
v.                              )
                                )
AUBURN SPORTSPLEX, LLC, DENNIS  )
NATOLI, JOHN NATOLI, and PETER  )
NATOLI,                         )
                  Defendants    )
*********************************
```

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1331 in that this action involves, among other statutes, the securities laws of the United States; and pursuant to 28 U.S.C. Section 1332 in that this case also involves citizens of different states and an amount in controversy of more than $75,000.00.

2.  Venue is proper in this district pursuant to 15 U.S.C. Section 78aa and pursuant to 28 U.S.C. Section 1391 because certain of the transactions, acts, practices and courses of conduct constituting violations of the laws alleged occurred within this district and because defendants reside in and transact business in this district.

## SUMMARY

3. This case involves the defendants' offer and sale, through interstate commerce, of securities in a private limited liability corporation, Auburn Sportsplex, LLC (hereinafter, "Auburn").

4. Beginning on or about the second week of June, 2003 and continuing thereafter, the defendants made material misrepresentations and/or failed to disclose material facts to the plaintiff, a non-accredited investor, with regard to the offer and sale of securities in Auburn.

5. Said securities were not registered with the U.S. Securities and Exchange Commission or with the Commonwealth of Massachusetts; nor were they exempt from registration.

6. By engaging in the conduct alleged in this Amended Complaint, the defendants have violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. Section 78j(b) and the regulations promulgated thereunder.

7. Moreover, by engaging in the conduct alleged in this Amended Complaint, the defendants have breached contractual and fiduciary obligations owed to the plaintiff. Further, the individual defendants have violated state law by, among other things, committing unfair and deceptive practices as provided in Massachusetts General Laws Chapter 93A, the Massachusetts Consumer and Business Protection Act and the regulations promulgated thereunder.

## THE PARTIES

8. The Plaintiff, Christian Schwenk ("Schwenk") is a natural person with a permanent residence at 1015 Olive Tree Circle, West Palm Beach, Florida 33413.

9. Upon information and belief, Defendant, Auburn Sportsplex, LLC ("ASP"), is a limited liability company organized under the laws of the Commonwealth of Massachusetts on or about July 12, 2002 with its main offices located at 5 Saint Mark Street, Auburn, Massachusetts.

10. Upon information and belief, Defendant, Dennis Natoli is a natural person with a permanent residence at 370 South Street, Auburn, Massachusetts.

11. Upon information and belief, Defendant, John Natoli is a natural person, has a permanent residence at 13 Gilbert Way in Millbury, Massachusetts.

12. Upon information and belief, Defendant, Peter Natoli, is a natural person with a permanent residence at 406 Treasure Island, Webster, Massachusetts.

13. Plaintiff is not, nor has he ever been at any time material to this action, an accredited investor as that term is defined by the rules administered by the U.S. Securities and Exchange Commission; nor has plaintiff been, at any time material to this action, a sophisticated investor who, with any degree of regularity, provided substantial funds to others with the expectation that through the efforts of the recipients of the investment funds, plaintiff would obtain significant monies as a result of the efforts of the recipients of said funds.

## FACTUAL ALLEGATIONS

14. Auburn is a limited liability company organized under the laws of the Commonwealth of Massachusetts on or about July 12, 2002.

15. The Certificate of Organization filed with the Office of the Massachusetts Secretary of State on or about July 12, 2002 named Defendant, Peter Natoli as the sole manager of

Auburn. This Certificate also named Defendant Peter Natoli as the resident agent for Auburn for purposes of service of process.

16. According to Paragraph 4 of the Certificate of Organization, "[t]he general character of the business of the LLC [Auburn] is to engage in: investment in, and ownership and development of, real estate and interests therein, including buying, acquiring, owning, operating, selling, financing, refinancing, disposing of and otherwise dealing with interests in real estate, either directly or indirectly through joint ventures, partnerships or other entities; and to engage in any activities directly or indirectly related or incidental thereto."

17. At all times pertinent to this case, Auburn maintained its principal place of business at 5 St. Mark Street, Auburn, MA 01501.

18. At all times pertinent to this case, the individual defendants each owned substantial percentages of Auburn.

19. The individual defendants are all related to one another as they are brothers within the same family, one to another. Based on the foregoing, the individual defendants constitute a "control group" as that term is interpreted under the securities laws of the United States.

20. The individual defendants regularly consulted with one another concerning, among other things, Auburn's operations and the financial standing of Auburn

21. On or about December 18, 2002, the Defendant Auburn entered into a loan agreement (hereinafter the "Loan Agreement") in the amount of $950,000 with North Brookfield Savings Bank (hereinafter "NBSB").

22. Attendant to the Loan Agreement with NBSB, was a note executed on or about December 18, 2002 which, among other things, obligated each of the individual defendants to pay the loan amount.

23. Attendant to the Loan Agreement with NBSB, was an unlimited guaranty executed on or about December 18, 2002 which, among other things, provided NBSB with a continuing lien and security interest in all deposits or other sums at any time credited by or due from NBSB with regard to Auburn.

24. Attendant to the Loan Agreement with NBSB, was a security agreement executed on or about December 18, 2002, which, among other things, included an irrevocable and unconditional assignment to NBSB of all of Auburn's rights and benefits in all amounts owed Auburn with respect to the use of or occupancy of the property at which Auburn conducted business.

25. On or about June 23, 2003, plaintiff received a package of information at his residence in Florida from one or more of the individual defendants concerning an investment opportunity in a sports facility located in Auburn, Massachusetts.

26. One of more of the individual defendants arranged for the transmittal of the documentation concerning Auburn referred to in the preceding paragraph from Massachusetts to plaintiff through the mails or via some other instrumentality of interstate commerce.

27. The documentation referred to in paragraphs 22 and 23 above included, among other things, an undated letter on Auburn letterhead signed by Defendant John Natoli which contained the following statement: "This investment is protected by real estate and it

should give you a return from 18% to 30%." A copy of this letter is attached hereto and incorporated by reference herein as <u>Exhibit A.</u>

28. The documentation referred to in paragraphs 22-24, above, did not include a copy of the NBSB loan, or any of the documents attendant thereto, referred to in paragraphs 17-20, above.

29. In reliance on the various written and oral representations made by the defendants, on or about July 21, 2003, plaintiff arranged for the wire transfer of $100,000 from plaintiff's account at Washington Mutual Bank to an account Auburn maintained at Sovereign Bank.

30. Upon information and belief, the Auburn account at Sovereign Bank referred to in the preceding paragraph was in conflict with the specific terms of the NBSB loan agreement placing Auburn at risk of default.

31. On or about July 30, 2003, the individual named defendants held a meeting at which, among other things, defendant John Natoli presented "an employment contract for operating the sportsplex". A copy of the minutes of said meeting is attached hereto and incorporated by reference herein as <u>Exhibit B.</u>

32. The "employment contract" referred to in the preceding paragraph included, among other terms, that defendant John Natoli would "[m]anage all functions, sales, employment, maintenance, scheduling, advertising, accounting and future growth decisions" for Auburn. A copy of said "employment contract" entitled "Independent Contractor Agreement" dated August 1, 2003 between Auburn and defendant John Natoli is attached hereto and incorporated by reference herein as <u>Exhibit C.</u>

33. The August 1, 2003 agreement referenced in the preceding paragraph provided, among other things, for Auburn to pay defendant John Natoli $3,000 per month plus $400 per month for medical insurance and $400 per month as an automobile allowance.

34. At the meeting of July 30, 2003 referred to in paragraph 30, the individual defendants agreed by a vote of 3-0 to approve the August 1, 2003 agreement (Exhibit C) between defendant John Natoli and Auburn.

35. At no time relevant to this action did defendants provide plaintiff with a copy of the minutes of the July 30, 2003 meeting (Exhibit B), nor did defendants provide plaintiff with a copy of the August 1, 2003 agreement (Exhibit C) between Auburn and defendant John Natoli.

36. On or about August 20, 2003, Plaintiff executed a document entitled "Ownership Purchase Agreement" (hereinafter "the Agreement"). The Agreement was also signed by Defendants John V. Natoli, Peter Natoli and Dennis Natoli. Said signing occurred in Auburn, Massachusetts.

37. The Agreement referred to in the preceding paragraph (attached hereto and incorporated by reference herein as Exhibit D) stated, among other things, "the Seller shall sell to the Purchaser this document that certifies investment ownership of Five percent of Corporation in consideration of the purchase price set forth in this Agreement. This certificate representing ownership of Five Percent of all Assets, Net Profits and any Beneficial entities of the Corporation, shall be duly endorsed and accompanied by appropriate signatures of transfer powers duly executed in blank . . . . "

38. At no time material to this action did the plaintiff receive a certificate related to plaintiff's investment in Auburn as identified in the preceding paragraph.

39. In a letter dated April 16, 2004 and sent postage prepaid, certified, to Defendants Peter Natoli and John Natoli, plaintiff: (a) asked the aforementioned defendants for information regarding the operation of Auburn; (b) reminded said defendants of plaintiff's need for monthly dividend income payments following a 6 month period; and (c) referenced plaintiff's intent to exercise the refund provision of the Ownership Purchase Agreement.

40. In a letter dated August 19, 2004 and sent postage prepaid, certified, to defendant Peter Natoli, plaintiff, through the undersigned counsel, requested access to pertinent documentation concerning the Auburn operation and its financial condition.

41. Despite representations to the contrary, plaintiff was continually denied access to the documentation referred to in the preceding paragraph in contravention of M.G.L. c. 156c.

42. In correspondence dated December 9, 2004, plaintiff, through the undersigned counsel, made a demand pursuant to M.G.L c 93A by sending a letter postage prepaid, certified, to defendants Peter Natoli and John Natoli.

43. Defendants failed to respond to the 93A demand letter referenced in the preceding paragraph.

44. Plaintiff filed the subject action on May 11, 2005.

45. Despite repeated requests made of Defendants, plaintiff did not receive any documentation prior to filing the subject action, but for two forms related to 2003 tax returns prepared by Auburn's accountant in March, 2005.

### COUNT I
### VIOLATION OF FEDERAL SECURITIES LAWS:
### MISREPRESENTATIONS, OMISSIONS AND DECEPTIVE PRACTICES

46. Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-44, above.

47. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter, knowingly, willingly and/or recklessly:

   a. Employed devices, schemes or artifices to defraud;

   b. Made untrue statements of material fact or omitted to state a material fact(s)necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   c. Engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons; in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

48. Plaintiff relied on defendants' untrue statements of material fact, detailed above, when purchasing Auburn securities.

49. Plaintiff's reliance on defendants' untrue statements of material fact detailed above as well as defendants' omissions, unlawful acts and course of business resulted directly in plaintiff's financial loss.

50. By reason of the foregoing, defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. Section 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. Section 240.10b-5.

## COUNT II
## BREACH OF CONTRACT

51. Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-49, above.

52. On August 20, 2003, the parties to this action implemented the terms of the Agreement at a closing.

53. Pursuant to terms of the Agreement, Exhibit A, par.(c), the parties agreed "Refund of Payment. If for any reason within the first twelve months of this agreement , the Purchaser decides to sell his ownership of the Corporation, a notice in writing to Sellers only, the sellers will refund Purchasers, within and no longer than Ninety Days of such delivered notice."

54. On August 19, 2004, Plaintiff exercised the buyback option by letter of same date, copy of which is attached as Exhibit E.

55. Defendants have failed and refused to buyback Plaintiff's shares in accordance with the agreement, and therefore breached the contract.

56. As a direct and proximate result, Plaintiff has been deprived of the return of his investment in the amount of $100,000.00, and has been deprived of the use of his money.

## COUNT III
## BREACH OF FIDUCIARY DUTY

57. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-44. above.

58. Actions taken, or not taken by defendants in, among other things, not filing annual reports with the Office of the Secretary of State, Commonwealth of Massachusetts, not filing state and federal tax returns on a timely basis, failing to properly hold annual meetings, failure to disclose material facts related to Auburn's financial condition and all obligations that were material to Auburn's business, were intended and had the affect of depriving plaintiff of relevant and necessary information with which plaintiff could

monitor his investment.

59. Defendants' promises, affirmations and representations were, at the time they were made to plaintiff, incomplete, untrue and/or devoid of relevant and material information.

60. Defendants owed plaintiff a duty to act in good faith and with due regard for plaintiff's Interests.

61. Defendants failed to act in good faith and with due regard to plaintiff's interest, thereby breaching their fiduciary obligation.

62. As a result of the aforementioned breach of fiduciary duties, plaintiff lost the right to participate in Auburn's decision making process and other incidental benefits to which plaintiff was entitled.

63. Defendants are liable to plaintiff as a result of their breach of fiduciary duties and minority freeze out.

64. As a result of the foregoing, plaintiff has been damaged in the amount of $100,000.00 plus interest, plus attorneys' fees.

## COUNT IV
## TORT: CONSPIRACY

65. Plaintiff realleges and restates paragraphs 1 through 63, above, in their entirety.

66. Defendants combined together and entered in a plan to offer and sell plaintiff personal property, i.e., an interest in Auburn, a limited liability company, by deceit or fraud.

67. Defendants hid the true facts regarding the performance of Auburn, its financial condition, the propriety of its actions and the manner in which it was operated.

68. Defendants combined to, among other things, deprive plaintiff of relevant information, information to which plaintiff was entitled as a matter of law.

69. Defendants' conduct was a combination entered into for an unlawful purpose; it was carried out through unlawful means and it violated M.G.L. c. 231, Section 85J.

70. Defendants' actions were the proximate cause of plaintiff's damages.

71. As a result of the foregoing, plaintiff has been damaged in the amount of actual damages of $100,000, plus loss of interest, plus reasonable attorneys' fees, plus treble damages as provided by M.G.L. c. 231, Section 85J.

## COUNT V
## VIOLATION OF MGL CHAPTER 93A

72. Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 70 , above.

73. At all time relevant hereto, defendants were engaged in trade or commerce within the meaning of M.G.L. c. 93A.

74. Defendants misrepresentations and failure to disclose relevant facts as set forth above were unfair and deceptive trade practices which were material, which were undertaken willfully and knowingly, and which caused proximate damage to plaintiff in violation of M.G.L. c 93A and Code of MA Reg, Att'y General 3:16.

75. Defendants failed to make a reasonable offer of settlement to plaintiff as required by M.G.L. c. 93A.

76. As a result of the foregoing, plaintiff has been damaged in the amount of $100,000, plus multiple damages and attorneys fees.

## COUNT VI
## APPOINTMENT OF RECEIVER

77..Plaintiff realleges and incorporates by reference herein the allegations set forth in
paragraphs 1 through 75 above.

78. Since it began operations as a sports facility, Auburn has generated and continues to
generate a significant amount of revenue upon the receipt of fees paid by members of the
public who have utilized Auburn's facilities.

79. Upon information and belief, much of the revenue Auburn has generated and continues to
generate has been as the result of monies obtained in the form of cash or personal
check(s) and/or credit payments made by those who have used the Auburn facilities.

80. Upon information and belief, there are serious and continuing deficiencies in Auburn's
system of creating and maintaining its books and accounts by Auburn, its control group,
its agents and contractors.  These deficiencies call into question the validity of the
financial standing of Auburn and various receipts and expenditures noted in the Auburn
books and records, as well as the validity of the federal and state tax returns that have
been previously prepared and/or filed by or on behalf of Auburn.

81. Upon information and belief, defendants have been engaged in conduct which has
prejudicially affected the business purposes and standing of Auburn.

82. As a result of the foregoing, plaintiff has suffered economic injury.

83. As a result of the foregoing, there is no adequate remedy at law to redress the damages
Plaintiff has suffered and this Court should appoint a receiver.

WHEREFORE, Christian Schwenk demands judgment of the Defendants in the amount of
his damages, together with interest, costs, attorney fees, and to award such other and further

relief to plaintiff as this Court deems just and equitable, including, as applicable, and award of multiple damages.

Plaintiff, Christian Schwenk, Demands Trial By Jury On All Issues Triable to a Jury

Plaintiff,
By his attorney,

Douglas L. Fox, Esq
BBO#:   176380.
Shumway, Giguere & Fox, PC
19 Cedar Street
Worcester, MA  01609
(508) 756-2323

# EXHIBIT
# A



*6/23/02*

*Peter Call*
*508-330-4426*
*HSE 508-949-9309*

Dear Chris,

How are you? I hope all is now starting to go well for you. As you know we are in the final stages of our sport dome. I'm happy to hear you are interested in investing in the SportsPlex. Just as we invested in our building that abutts the dome, it is all friends and family and was one of the best investments all the partners have made. The same stands for this project. The bank appraisal without equipment was $1.7 million. This will only grow as the success begins when we open. We have been characterized by the media as the largest and utlimate professional training facility in New England. And they are right! This investment is protected by real estate and it should give you a return from 18% to 30%. We could of had other investors, but the people I know with serious money are not interested in receiving part of their profits in CASH. This is something that you have to use your cash profits to spend and not put in a bank, in order to protect all of us. I hope you understand this. I'm tired of paying big bucks to Uncle Sam! I hope you can come out and see, feel and touch this project. We have plans for a second and have bank approval after we show a positive cash flow. You will be part of that also. As you know, we had a terrible winter, which has caused overruns in our estimates of cost and delayed opening and deleted projected earnings. Your investment will help complete our project. We have a phonominal staff, with professional athletes in Baseball, football and soccer. College coaches in the same sports, plus softball, LaCross, cheerleading and Golf. We also have a health center on the second level, that will give a constant cash flow due to membership. We have been asked to host dog agility shows, they pay as much as $12,000.00 for a Sunday. Our baseball Academy is state of the art. Our college placement, which will start with our Pre-School programs has a response of over 200 colleges. Professional scouts are going to host showcases for New England Prospects.

Enclosed is a summary business plan, of what the bank approved, with pictures of what the dome looks like. I wish I had something like this when I grew up. If you have any questions my cell is 774-696-2211.

Hope to see you soon.

John

# EXHIBIT B

Auburn Sportsplex LLC
Minutes
July 30 2003
(6pm)

The meeting was called to order
with all Stockholders present (Peter Natoli, Dennis
Natoli and John Natoli).

Peter Natoli presented a sale of a John
Deer Back hoe that would save money on
construction and could also be used for snow
removal. A 3-0 vote to try to purchase
such vehicle.

John Natoli presented an employment
contract for operating the Sportsplex (see
Attachment). Contract was agreed upon voted
3-0.

It was agreed that Pro-Batter would be
the pitching machines used at the sportsplex and
decided to purchase instead of leasing. Vote
3-0.

Peter said after reviewing several different
Turf companies, that Pro-Green is what we should
use. Voted 3-0.

Meeting was adjourned at 8pm.

Secty

John Natoli

# EXHIBIT C

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is made and effective this August 1, 2003, by and between john natoli ("Consultant") and Auburn SportsPlex ("Company").

Now, therefore, Consultant and Company agree as follows:

## 1. Engagement.
Company hereby engages Consultant, and Consultant accepts engagement, to provide to Company the following services:

Manage all functions, sales, employment, maintenance, scheduling, advertising, accounting and future growth decisions.

## 2. Term.
Consultant shall provide services to Company pursuant to this Agreement for a term commencing on August 1, 2003 and ending on July 31, 2006.

## 3. Place of Work.
Consultant shall render services primarily at Consultant's offices, but will, upon request, provide the services at Company offices or such other places as reasonably requested by Company as appropriate for the performance of particular services.

## 4. Time.
Consultant's daily schedule and hours worked under this Agreement on a given day shall generally be subject to Consultant's discretion, provided that Consultant and Company anticipate that Consultant shall work on average forty hours per week in the performance of services pursuant to this Agreement. Company relies upon Consultant to devote sufficient time as is reasonably necessary to fulfill the spirit and purpose of this Agreement.

## 5. Payment.
Company shall pay Consultant three thousand dollars per month plus four hundred dollars per month for medical insurance and four hundred dollars per month for automobile allowance. for services performed pursuant to this Agreement. Payment shall be made monthly. Consultant shall bear all of Consultant's expenses incurred in the performance of this Agreement.

## 6. Covenant Not to Compete.
During the term of this Agreement and for a period of 1 year thereafter, Consultant shall not within 5 mile radius, directly or indirectly, either for his own account, or as a partner, shareholder, officer, director, employee agent or otherwise, own, manage, operate, control be employed by, participate in, consult with, perform services for, or otherwise be connected with any business the same as or similar to the business conducted by Company. In the event any of the provisions of this Section 6 are determined to be invalid by reason

of their scope or duration, this Section 6 shall be deemed modified to the extent required to cure the invalidity. In the event of a breach, or a threatened breach, of this Section 6, Company shall be entitled to obtain an injunction restraining the commitments or continuance of the breach, as well as any other legal or equitable remedies permitted by law.

7. **Confidentiality**

During the term of this Agreement, and thereafter for a period of two (2) years, Consultant shall not, without the prior written consent of Company, disclose to anyone any Confidential Information. "Confidential Information" for the purposes of this Agreement shall include Company's proprietary and confidential information such as, but not limited to, customer lists, business plans, marketing plans, financial information, designs, drawing, specifications, models, software, source codes and object codes. Confidential Information shall not include any information that:

    A.  is disclosed by Company without restriction;

    B.  becomes publicly available through no act of Consultant;

    C.  is rightfully received by Consultant from a third party.

8. **Termination**

A.  This Agreement may be terminated by Company as follows:

    i.    If Consultant is unable to provide the consulting services by reason of temporary or permanent illness, disability, incapacity or death.

    ii.   Breach or default of any obligation of Consultant pursuant to Section 6, Covenant Not to Compete, or Section 7, Confidentiality, of this Agreement.

    iii.  Breach or default by Consultant of any other material obligation in this Agreement, which breach or default is not cured within five (5) days of written notice from Company.

B.  Consultant may terminate this Agreement as follows:

    i.    Breach or default of any material obligation of Company, which breach or default is not cured within five (5) days of written notice from Consultant.

    ii.   If Company files protection under the federal bankruptcy laws, or any bankruptcy petition or petition for receiver is commenced by a third party against Company, any of the foregoing of which remains undismissed for a period of sixty (60) days.

9. **Independent Contractor**

Consultant is and throughout this Agreement shall be an independent contractor and not an employee, partner or agent of Company. Consultant shall not be entitled to nor receive any benefit normally provided to Company's employees such as, but not limited to, vacation payment, retirement, health care or sick pay. Company shall not be responsible for withholding income or other taxes from the payments made to Consultant. Consultant shall be solely responsible for filing all returns and paying any income, social security or other tax levied upon or determined with respect to the payments made to Consultant pursuant to this Agreement.

10. **Tools and Supplies**

Unless otherwise agreed to by Company in advance, Consultant shall be solely responsible for procuring, paying for and maintaining any computer equipment, software, paper, tools or supplies necessary or appropriate for the performance of Consultant's services hereunder.

11. **Controlling Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Massachusetts .

12. **Headings**

The headings in this Agreement are inserted for convenience only and shall not be used to define, limit or describe the scope of this Agreement or any of the obligations herein.

13. **Final Agreement**

This Agreement constitutes the final understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, understandings and agreements between the parties, whether written or oral. This Agreement may be amended, supplemented or changed only by an agreement in writing signed by both of the parties.

14. **Notices**

Any notice required to be given or otherwise given pursuant to this Agreement shall be in writing and shall be hand delivered, mailed by certified mail, return receipt requested or sent by recognized overnight courier service as follows:

    If to Consultant:
    john natoli
    **13 Gilber Way, Millbury, Ma  01527**

    If to Company:
    Auburn SportsPlex
    5 Saint Mark St, Auburn, MA

15. **Severability**

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or

unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

IN WITNESS WHEREOF, this Agreement has been executed by the parties as of the date first above written.

Auburn SportsPlex

_____                    By: _____
john natoli                                 Peter Natoli
                                            President

# EXHIBIT
# D

## OWNERSHIP PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this 23 day of june, 2003, by and between John, Peter & Dennis Natoli, ("Seller") and Christopher B Schwink, ("Purchaser"):

WHEREAS, the Seller is the record owners of Auburn SportsPlex LLC, ("Corporation"), a Massachusetts corporation; and

WHEREAS, the Purchaser desires to purchase Five Percent ownership of Auburn SportsPlex LLC and the Seller desires to sell Five percent of ownership, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the investment into the Corporation for Five Percent ownership, it is hereby agreed as follows:

1. PURCHASE AND SALE: Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell to the Purchaser this document that certifies investment ownership of Five percent of Corporation in consideration of the purchase price set forth in this agreement. This certificate representing ownership of Five Percent of all Assets, Net Profits and any Beneficial entities of the Corporation, shall be duly endorsed and accompanied by appropriate signatures of transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary signatures affixed thereto at the expense of the Seller. The closing of the transactions contemplated by this Agreement ("Closing"), shall be held at 5 Saint Mark St, on ~~June 30,~~ 2003 , at 6pm , or such other place, date time as the parties hereto may otherwise agree. ~~TBS~~ Aug 29, 2003

2. AMOUNT AND PAYMENT OF PURCHASE PRICE. The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF SELLER. Seller hereby warrants and represents:

(a) Organization and Standing. Corporation is a corporation duly organized, validly exhisting and in good standing under the laws of the state of Massachusetts and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions of Ownership.
    i. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation in any third person or relating to the voting of the Corporations Powers.
    ii Seller is the lawful owner of the Corporation, free and clear of all security interests, liens, encumbrances, equities and other charges.
    iii There are no existing warrants, options, ownership purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the Corporation.

4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER. Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

(a) Entire agreement. This Agreement (including the exhibits hereto and any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Massachusetts. The parties herein waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in Worcester County, State of Massachusetts. In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, sealed and delivered in the presence of:

By:_____  John V Natoli

By:_____  Peter Natoli

By:_____  Dennis Natoli

By:_____  Christian B Schwenk SS#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

By:_____

## EXHIBIT "A"

## AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration. As total consideration for the purchase and sale of the Corporation( 5) Five Percent ownership, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of One Hundred Thousand Dollars ($100,000.00), such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payment. The Purchase Price shall be paid as follows:

i. The sum of One Hundred Thousand Dollars ($100,000.00) to be delivered to Seller at Closing, no later than June 30, 2003.

(c) Refund of Payment. If for any reason within the first twelve months of this agreement, the Purchaser decides to sell his ownership of the Corporation, a notice in writing to Sellers only, the sellers will refund Purchasers, within and no longer than Ninety Days of such delivered notice.

(d) Liabilities. The Purchasers Liabilities are limited to the investment of $100,000.00.

By: _____ John V. Natoli

By: _____ Peter Natoli

By: _____ Dennis Natoli

By: _____ ~~Christopher B Schwank~~ *CHRISTIAN B. Schwank*

By: _____

# EXHIBIT
# E

## Law Offices of Paul E. Linet

A Professional Corporation

Post Office Box 533
Acton, MA 01720-0533

Tel: (978) 264-9600 • Fax: (978) 264-9090 • URL: http://www.linetlaw.com

August 19, 2004

Peter Natoli
Auburn Sportsplex, LLC
5 St. Mark Street
Auburn MA 01501

### Demand for Refund of Payment on Behalf of
### Christian Schwenk

Dear Mr. Natoli:

As I informed you during our telephone conversation of August 18, 2004, this firm represents Christian Schwenk, a resident of West Palm Beach, Florida and responds to your request for a written statement concerning the information that Mr. Schwenk has asked this office to obtain from Auburn Sportsplex, LLC ("the LLC").

In connection with Mr. Schwenk's ownership interest in the LLC, this office respectfully requests the opportunity to inspect and copy the following documentation:

1. A current list of the full name and address of each member of the LLC;
2. A copy of the Certificate of Organization and any certificates of amendment and annual reports filed with the Commonwealth of Massachusetts subsequent to July 12, 2002;
3. Copies of the LLC's federal and state income tax returns filed since the LLC's inception;
4. Copies of any written operating agreements currently in effect;
5. Copies of all financial statements of the LLC prepared since its inception;
6. A written statement of the amount of cash and a description and statement of the agreed value of the other property or services contributed by each member of the LLC;
7. A written statement regarding the right of any member to receive distributions from the LLC.

Under applicable law, the foregoing records are mandated to be kept by the LLC and, upon proper request, are further required to be made available during ordinary business hours. Please provide the undersigned with a convenient time during the next 10 days when the documentation will be available for

Law Offices
## Paul E. Linet, P.C.

inspection at the LLC's offices. We shall than make arrangements to review
the documentation and make copies, at our expense.

As you know, in a letter dated April 16, 2004 (a copy of that correspondence
is enclosed hereto and incorporated by reference herein), Mr. Schwenk stated
that he had not received data regarding the operation of the LLC. You will also
note in his correspondence dated April 16, 2004, Mr. Schwenk highlighted his
concerns and expressed his intent to invoke the refund clause set forth in
Exhibit "A" to the Ownership Purchase Agreement (copy enclosed).
**THEREFORE, PLEASE TAKE NOTE THAT MR. SCHWENK HEREBY INVOKES
CLAUSE (c) "Refund of Payment" and demands refund of his investment.
Pursuant to that provision in Exhibit A, we fully expect that the
arrangements to sell Mr, Schwenk's ownership interest in the LLC will be
completed within ninety days.**

I contacted Auburn Sportsplex, LLC by telephone on August 18, 2004 in an
effort to amicably resolve any outstanding issues involving the parties. It is
still our expectation that such a resolution may be achieved. In that you
requested a written communication identifying the material we currently seek
to review, we have complied with your request.

Should you have any questions concerning the substance of this
correspondence, please contact the undersigned as soon as possible. We look
forward to receiving your response so that we can proceed to rectify any and
all open issues.

                            Sincerely yours,
                            Law Offices of Paul E. Linet, P.C.
                            Attorney to Christian Schwenk


                    By:    _Paul E. Linet_
                            Paul E. Linet

PEL:lom
Enclosures
Via Overnight Courier
DHL/ABX 5361451141

Copy to: C. Schwenk

Answer



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Civil Action No. 05-40071-FDS

CHRISTIAN SCHWENK
     Plaintiff,

v.

AUBURN SPORTSPLEX, LLC,
DENNIS NATOLI, JOHN NATOLI,
AND PETER NATOLI,
     Defendants

### ANSWER OF DEFENDANTS AUBURN SPORTSPLEX, LLC, DENNIS NATOLI, JOHN NATOLI AND PETER NATOLI TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Auburn Sportsplex, LLC, Dennis Natoli, John Natoli, and Peter Natoli (hereinafter collectively "Defendants") respond to the corresponding numbered paragraphs of Christian Schwenk's (the "Plaintiff") First Amended Complaint as follows:

1.     Paragraph 1 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

2.     Paragraph 2 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

3.     Paragraph 3 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

4.     Defendants deny the allegations contained in Paragraph 4 of Plaintiff's Amended Complaint.

5.     Paragraph 5 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

6.     Paragraph 6 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

7.  Defendants deny the allegations contained in Paragraph 7 of Plaintiff's Amended Complaint.

8.  Defendants admit the allegations contained in Paragraph 8 of Plaintiff's Amended Complaint.

9.  Defendants admit the allegations contained in Paragraph 9 of Plaintiff's Amended Complaint.

10. Defendants admit the allegations contained in Paragraph 10 of Plaintiff's Amended Complaint.

11. Defendants admit the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint.

12. Defendants admit the allegations contained in Paragraph 12 of Plaintiff's Amended Complaint.

13. Paragraph 13 contains conclusions of law to which no responsive pleading is required; to the extent that a response is required, denied.

14. Defendants admit the allegations contained in Paragraph 14 of Plaintiff's Amended Complaint.

15. Defendants admit the allegations contained in Paragraph 15 of Plaintiff's Amended Complaint.

16. Defendants submit that the document speaks for itself.  Therefore, no responsive pleading is required.

17. Defendants admit the allegations contained in Paragraph 17 of Plaintiff's Amended Complaint.

18. It is not clear what percentage of ownership is to be considered "substantial".  Further answering, the actual percentage of ownership interests is reflected in documents produced during the Automatic Disclosure.

19. Defendants admit that individual defendants are brothers, but deny the remaining allegations of Paragraph 19.

20. Defendants admit that they consulted with one another on various business related matters.

21. Defendants admit the allegations contained in Paragraph 21 of Plaintiff's Amended Complaint.

22. Defendants admit the allegations contained in Paragraph 22 of Plaintiff's Amended Complaint.

23. Defendants submit that the document speaks for itself. Therefore, no responsive pleading is required.

24. Defendants submit that the document speaks for itself. Therefore, no responsive pleading is required.

25. Defendants admit to having sent to Plaintiff a package containing information about a sports facility at Plaintiff's request. Defendants further state that the documents speak for themselves, therefore, no responsive pleading is required.

26. Defendants admit to having sent to Plaintiff a package containing information about a sports facility at Plaintiff's request.

27. Defendants deny the allegations contained in Paragraph 27 of Plaintiff's Amended Complaint. Further answering, the documentation referred to in ¶22 and 23 do not relate to the letter.

28. This allegation makes no sense. Paragraph 22 to 24 do include reference to the NBSB Loan. Paragraphs 17-20 relate to other matters. To the extent that a response is required, denied.

29. Defendants admit that Schwenk wired $100,000.00 to Auburn on or about July 21, 2003, but are without information or knowledge to admit or deny the remaining allegations.

30. Defendants deny the allegations contained in Paragraph 30 of Plaintiff's Amended Complaint.

31. Defendants admit the allegations contained in Paragraph 31 of Plaintiff's Amended Complaint.

32. Defendants submit that the document speaks for itself. Therefore, no responsive pleading is required.

33. Defendants submit that the document speaks for itself. Therefore, no responsive pleading is required.

34. Defendants admit the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint.

35. Defendants deny the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint.

36.    Defendants admit that Plaintiff executed a document entitled "Ownership Purchase Agreement". Defendants further admit that John V. Natoli, Peter Natoli and Dennis Natoli also signed an Agreement. Defendants deny the remaining allegations contained in Paragraph 36 of Plaintiff's Amended Complaint and deny that certain handwritten changes to the Agreement were agreed to by the Defendants.

37.    Defendants submit that the document speaks for itself. Therefore, no responsive pleading is required.

38.    Defendants deny the allegations contained in Paragraph 38 of Plaintiff's Amended Complaint.

39.    Defendants admit that it received a letter dated April 16, 2004 from the Plaintiff. Further answering, the document speaks for itself.

40.    Defendants admit that it received a letter dated August 19, 2004 from counsel for Plaintiff. Further answering, the documents speaks for itself.

41.    Defendants deny the allegations contained in Paragraph 41of Plaintiff's Amended Complaint.

42.    Defendants admit that it received a demand letter dated December 9, 2004 from counsel for Plaintiff. Further answering, the documents speaks for itself.

43.    Defendants admit that they did not respond in writing.

44.    Defendants admit the allegations contained in Paragraph 44 of Plaintiff's Amended Complaint.

45.    Defendants deny the allegations contained in Paragraph 45 of Plaintiff's Amended Complaint.

## COUNT I
## VIOLATION OF FEDERAL SECURITIES LAWS:
## MISREPRESENTATIONS, OMISSIONS AND DECEPTIVE PRACTICES

46.    Defendant realleges and incorporates herein the answers set forth in paragraph 1-44 above.

47.    Defendants deny the allegations contained in Paragraph 47 of Plaintiff's Amended Complaint.

48.    Defendants deny the allegations contained in Paragraph 48 of Plaintiff's Amended Complaint.

49.    Defendants deny the allegations contained in Paragraph 49 of Plaintiff's Amended Complaint.

50.    Defendants deny the allegations contained in Paragraph 50 of Plaintiff's Amended Complaint.

## COUNT II
## BREACH OF CONTRACT

51.    Defendant realleges and incorporates herein the answers set forth in paragraph 1-49 above.

52.    Defendants deny the allegations contained in Paragraph 52 of Plaintiff's Amended Complaint.

53.    Defendants submit that the document speaks for itself.  Therefore, no responsive pleading is required.

54.    Defendants deny the allegations contained in Paragraph 54 of Plaintiff's Amended Complaint.

55.    Defendants deny the allegations contained in Paragraph 55 of Plaintiff's Amended Complaint.

56.    Defendants deny the allegations contained in Paragraph 56 of Plaintiff's Amended Complaint.

## COUNT III
## BREACH OF FIDUCIARY DUTY

57.    Defendant realleges and incorporates herein the answers set forth in paragraph 1-44 above.

58.    Defendants deny the allegations contained in Paragraph 58 of Plaintiff's Amended Complaint.

59.    Defendants deny the allegations contained in Paragraph 59 of Plaintiff's Amended Complaint.

60.    Defendants deny the allegations contained in Paragraph 60 of Plaintiff's Amended Complaint.

61.    Defendants deny the allegations contained in Paragraph 61 of Plaintiff's Amended Complaint.

62.    Defendants deny the allegations contained in Paragraph 62 of Plaintiff's Amended Complaint.

63.    Defendants deny the allegations contained in Paragraph 63 of Plaintiff's Amended Complaint.

64.    Defendants deny the allegations contained in Paragraph 64 of Plaintiff's Amended Complaint.

## COUNT IV
## TORT:  CONSPIRACY

65.    Defendant realleges and incorporates herein the answers set forth in paragraph 1 through 63 above.

66.    Defendants deny the allegations contained in Paragraph 66 of Plaintiff's Amended Complaint.

67.    Defendants deny the allegations contained in Paragraph 67 of Plaintiff's Amended Complaint.

68.    Defendants deny the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint.

69.    Defendants deny the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint.

70.    Defendants deny the allegations contained in Paragraph 70 of Plaintiff's Amended Complaint.

71.    Defendants deny the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint.

## COUNT V
## VIOLATION OF MGL CHAPTER 93A

72.    Defendant realleges and incorporates herein the answers set forth in paragraph 1 through 70 above.

73.    Defendants deny the allegations contained in Paragraph 73 of Plaintiff's Amended Complaint.

74.    Defendants deny the allegations contained in Paragraph 74 of Plaintiff's Amended Complaint.

## Fourth Defense

Plaintiff has had access to all requested and relevant documents. The Defendants are ready and willing to provide Plaintiff with all relevant documents.

## Fifth Defense

This Court lacks subject matter jurisdiction.

## Sixth Defense

Plaintiff's Complaint is barred by estoppel.

## Seventh Defense

Plaintiff's Complaint is barred by ratification.

## Eighth Defense

Plaintiff's complaint is barred by waiver.

## Ninth Defense

The fraud claims are not plead with the required particularity.

The Defendants demand a trial by jury on all counts so triable.

Auburn Sportsplex, LLC
Dennis Natoli, John Natoli,
and Peter Natoli
by their attorneys,


*s/ William J. Ritter*
William J. Ritter, Esquire
BBO #552397
Natañia M. Davis, Esquire
BBO # 651838
Pojani Hurley Ritter & Salvidio, LLP
446 Main Street
Worcester, MA 01608
Phone: 508.798.2480

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2006, I served a copy of the within Defendants'
Auburn Sportsplex, LLC, Dennis Natoli, John Natoli and Peter Natoli Motion to Dismiss
Plaintiff's Complaint for Lack of Jurisdiction by mailing same postage prepaid upon:

Paul E. Linet, Esquire
Law Offices of Paul E. Linet, P.C.
PO Box 533
Acton, MA  01720

Douglas L. Fox, Esquire
Shumway, Giguere & Fox, P.C.
19 Cedar Street
Worcester, MA  01609

                                    *s/ William J. Ritter*                    .
                                    William J. Ritter, Esquire

Complaint for Accounting

Thomas
v.
Natoli, et al
( 03 E 0083 GC 1)

*f w Paul*
*r*

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss

**THE TRIAL COURT**
**PROBATE & FAMILY COURT DEPARTMENT**
**DOCKET NO.**

*03 E 0083 GC 1*
(2)

*Filed Aug 29, 2003*

```
_____  )
                                   )
ALEX THOMAS,                       )
      Plaintiff                    )
                                   )
v.                                 )
                                   )
PETER NATOLI, Trustee and DENNIS   )
NATOLI, Trustee OF THE ONE SAINT   )
MARK STREET REALTY TRUST,          )
      Defendants                   )
_____  )
```

## COMPLAINT FOR ACCOUNTING

1.      This complaint for an accounting between the beneficiary and trustees is brought

pursuant to General Law Chapter 215 §6, by virtue of which the Probate Court has original

jurisdiction of all matters cognizable under the "general principals of equitable jurisprudence ".

2.      The Plaintiff Alex Thomas resides at 4410 East Hubbell, Unit 73, Phoenix,

Arizona 85008.

3.      The Defendant Peter Natoli resides at 23 Oakes Street, Southbridge,

Massachusetts 01550.

4.      The Defendant Dennis Natoli resides at 370 South Street, Auburn, Massachusetts

01501.

5.      The Defendants are the Trustees of the One Saint Mark Street Realty Trust under

a Declaration of Trust dated February 21, 1997 and recorded with the Worcester District Registry

F:\docs\ThomasA\thomasa.010

| β

of Deeds in Book 18627, Page 76.

6.    The Plaintiff Alex Thomas is a beneficiary of the One Saint Mark Street Realty Trust, having a fifteen percent beneficial interest in said trust.

7.    Among other things, the Defendant Trustees manage the real estate at One Saint Mark Street, Auburn, Massachusetts.

8.    During the course of their management of said real property, the Defendants have engaged in self-dealing and other misconduct in breach of their fiduciary duties to the beneficiaries, including Mr. Thomas.

9.    The Defendants, although requested to do so, have failed and neglected to account to the Plaintiff for the value of the Plaintiff's share in the past and current profits of the Trust and for specific transactions including:

(a)    the lease of trust property to A-Tech;

(b)    an accounting of the most recent mortgage refinance of the One Saint Mark Street realty;

(c)    an accounting of payments made to Peter Natoli, Dennis Natoli and any family member or related family business from the One Saint Mark Street Realty Trust; and

(d)    an accounting of all payments made to contractors relative to the additions made to the One Saint Mark Street realty.

WHEREFORE, the Plaintiff prays that:

1.    a preliminary injunction issue against the Defendants, their agents, servants,

F:\docs\ThomasA\thomasa.010

employees or attorneys enjoining them from transferring, destroying or in any way alienating or parting with all of the books, records, receipts, checks, bills, check registers, notes or mortgages concerning or relating to the Trust;

2. an accounting be had in the Defendants ordered to pay to the Plaintiff his share of any wrongfully paid or distributed funds, together with such other damages as the Plaintiff may prove; and

3. for such other and further relief as this Honorable Court shall deem appropriate.

> Respectfully submitted,
> Plaintiff, Alex Thomas,
> By his attorneys,
>
> Robert S. White, BBO#552229
> Ellen O'Connor, BBO#651523
> Bourgeois, Dresser & White
> 4 Dix Street
> Worcester, MA 01609
> (508) 798-8801

Dated:    August 27, 2003

F:\docs\ThomasA\thomasa.010

Dennis Natoli

- Written Admission -

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Civil Action No. 05-40071-FDS

CHRISTIAN SCHWENK
    Plaintiff,

v.

AUBURN SPORTSPLEX, LLC,
DENNIS NATOLI, JOHN NATOLI,
AND PETER NATOLI,
    Defendants

## DEFENDANTS' RESPONSES TO PLAINTIFF'S
## FIRST SET OF REQUESTS TO ADMIT

The Defendants object to Plaintiff's First Set of Requests To Admit in its entirety based on untimely submission of same. Pursuant to the February 15, 2006, Amended Scheduling Order, all requests for admission were to be served by April 10, 2006. Plaintiff's first set of admission requests were belatedly served on May 31, 2006. Notwithstanding this objection and without waiving same, Defendants will respond to Admission #1.

During the deposition of Dennis Natoli, he was unable to testify as to whether his signature appeared on the Ownership Purchase Agreement because he did not have his glasses. Counsel for the parties agreed during that deposition to having the question answered by other means. See Deposition of Dennis Natoli, page 9 (attached hereto).

1.   Dennis Natoli did not sign the Ownership Purchase Agreement, Exhibit No. 4 of Schwenk deposition.

Resp. 1.     Admitted. Further answering, John Natoli signed Dennis Natoli's signature with his permission.

Signed under the pains and penalties of perjury this 12 day of June, 2006.

John Natoli

Dennis Natoli

Peter Natoli

Auburn Sportsplex, LLC

Auburn Sportsplex, LLC.
Dennis Natoli, John Natoli,
and Peter Natoli
by their attorneys,

William J. Ritter, Esquire
BBO #552397
Natañia M. Davis, Esquire
BBO # 651838
Pojani Hurley Ritter & Salvidio, LLP
446 Main Street
Worcester, MA 01608
Phone: 508.798.2480

1    Natoli", the third line down?

2          A.    It could, but it's a blur to me.

3          Q.    Do you need to get your glasses?

4          A.    I can't find them, because when we

5    went to lunch they were in my pocket, and as I

6    came up --. It's my only pair. Don't laugh.

7          Q.    It's kind of important to ask this

8    question. I don't know what we're going to do.

9                (Eyeglasses handed to witness.)

10               MR. RITTER: Off the record.

11               (Discussion off the record.)

12               MR. FOX: The witness has indicated

13   that it's difficult for him to read this without

14   his reading glasses, and we don't have a suitable

15   substitute for him, so counsel have agreed that

16   we'll work out some accommodation to get this

17   question answered whether or not that's his

18   signature, and, if it's not, does he know who put

19   it there.

20               MR. RITTER: Yes. Agreed to.

21               MR. FOX: Yes. I'm just thinking.

22               MR. RITTER: I'm sorry.

23         Q.    Do you have a driver's license with

24   you?

CERTIFICATE OF SERVICE

I hereby certify that on June _27_, 2006, I served a copy of the within DEFENDANTS'
RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS TO ADMIT by mailing same postage prepaid
upon:

Paul E. Linet, Esquire
Law Offices of Paul E. Linet, P.C.
PO Box 533
Acton, MA  01720

Douglas L. Fox, Esquire
Shumway, Giguere & Fox, P.C.
19 Cedar Street
Worcester, MA  01609

William J. Ritter, Esquire
Natañia M. Davis, Esquire

Plaintiff's Answer to Interrogatories

#2 on (6/10/06)
&
#8 on (4/25/06)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO.: 05 CV 40071-FDS

```
*************************************)
CHRISTIAN SCHWENK,                   )
                 Plaintiff           )
                                     )
v.                                   )
                                     )
AUBURN SPORTSPLEX, LLC, DENNIS )
NATOLI, JOHN NATOLI, and PETER       )
NATOLI,                              )
                 Defendants          )
*************************************
```

## PLAINTIFF'S ANSWERS TO DEFENDANT, DENNIS NATOLI'S FIRST SET OF INTERROGATORIES

1.    Please state your full name, date of birth, social security number, present residence, business or occupation, business address, if applicable, and residential address.

ANSWER:

        Christian B. Schwenk, 122 Parkway Court, Greenacres, FL, photographer (disabled).

2.    With respect to the allegations contained in Plaintiff's First Amended Complaint that "[b]egining on or about the second week of June 2003 and continuing thereafter, the    defendants made material misrepresentations and/or failed to disclose material facts to    plaintiff, a non-accredited investor, with regard to the offer and sale of securities in Auburn', state with specificity each and every fact that supports the allegation including:

        a. Each and every alleged material misrepresentation, the date of the misrepresentation, to    whom and by whom and by whom the misrepresentation was made, and whether it was    oral or written; and

        b. Each and every failure to disclosure material facts, the "material fact" at issue, the date    of such failure, and whether a specific request as to those facts and, if so, to whom and by whom the request was made, and whether the request was oral or written.

ANSWER:

By way of illustration and not limitation, I received a letter from John Natoli in June of 2003, in which the representation was made that I could expect returns on my investment of 18-30%. Also illustrative of the misrepresentations were the statements that the LLC was the outright owners of the land on which the sportsplex was built; that the LLC was, among other things, duly organized and had the authority to carry on its business as then conducted; that the defendants were not a party to any agreement creating rights in respect to the Corporation in any third person. Several of these statements were contained in the Ownership Purchase agreement prepared by the defendants.

On numerous occasions, I asked for and was told that the defendants would make quarterly reconciliations of the income generated by the Sportsplex and the debits paid. Despite repeated assurances, these reconciliations were not made. Instead, information was withheld. By way of illustration and not limitation, at or about the time defendants asked me to wire transfer $100,000 to their bank account, they did not disclose to me the fact that the LLC was out of funds and that it had, just days before, insufficient funds in the account to cover outstanding obligations. Also, it is my understanding that on July 30, 2003, the defendants held a meeting and adopted an employment agreement presented by John Natoli. Prior to this lawsuit, I was not provided with copies of minutes of purported meetings of the LLC or of copies of important documents such as the employment agreement.

3.    State with specificity each and every fact that supports the allegation in Plaintiff's First    Amended Complaint the defendants employed devices, schemes or artifices to defraud the Plaintiff.

ANSWER:

    In addition to the answers previously provided and by way of illustration and not limitation, the defendants failed to provide timely information on the financial condition of the LLC. failed to maintain adequate and accurate business records, failed to disclose related party transactions with One Saint Mark Street Realty Trust, commingled LLC funds with those of One Saint Mark Street Realty Trust, failed to provide all owners with notice(s) of meeting s of the LLC placed the LLC at risk of default on loans; disregarded corporate formalities and commingled LLC assets with other enterprises.

4.    Please clarify what exactly is meant in paragraph 47 of Plaintiff's First Amended Complaint by the allegation that defendants "made untrue statements of material fact or omitted to state a material fact(s) necessary [sic] in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

ANSWER:

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO.: 05 CV 40071-FDS

```
************************************)
CHRISTIAN SCHWENK,                  )
                Plaintiff           )
                                    )
v.                                  )
                                    )
AUBURN SPORTSPLEX, LLC, DENNIS      )
NATOLI, JOHN NATOLI, and PETER      )
NATOLI,                             )
                Defendants          )
************************************
```

## PLAINTIFF'S ANSWERS TO
## DEFENDANT'S INTERROGATORIES

1.    Please state your full name, date of birth, social security number, present residence, business or occupation, business address, if applicable, and residential address.

ANSWER:

   Christian B. Schwenk, SSN: 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, DOB: 5/14/51, 122 Parkway Court, Greenacres, FL 33413; photographer/disabled.

2.    For each and every occasion that you traveled to Auburn or Worcester,
Massachusetts
   regarding the Auburn Sportsplex, LLC state:

   a. the date and time you arrived in Auburn/Worcester;
   b. the date and time you left Auburn/Worcester;
   c. if you stayed overnight state where you stayed, the cost of the room or hotel and
who             or what entity paid the bill.

ANSWER:

I arrived in Boston at approximately 3:24 pm on August 15, 2003, on a flight from West Palm Beach, Florida. I was met at the airport by Dawn Brennes. She drove me to Auburn/

    c.    August 20, 2003;

    d.    John Natoli's home.

6.    For the handwritten changes on the first page of Exhibit C, state:

    a.    who made the handwritten changes;

    b.    when the handwritten changes were made;

    c.    at what location the changes were made; and

    d.    who was present at the time the changes were made.

ANSWER:

To the best of my recollection, I made the correction to my name appearing in the first sentence of the document; I corrected the date in Paragraph 1 of the document and initialed it at the end of that paragraph; John Natoli and Peter Natoli each affixed their initials at the end of Paragraph 1.
Please see answer to Interrogatory number 5.
John Natoli's home.
To the best of my memory John, Peter, and Peter's wife, Susan were in the home at the time.

7.    Please identify fully and completely each person whom the Plaintiff expects to call as an
    expert witness at the trial of the above entitled action by setting forth:

    a.    the name and address of each such expert;

    b.    the qualifications of each such expert;

    c.    the subject matter upon which each such expert is expected to testify;

    d.    the facts and opinions to which each such expert is expected to testify; and

    e.    the grounds for each opinion which each such expert is expected to give.

ANSWER:

    Not yet determined.

8.    With respect to each communication, verbal or written, which Plaintiff, its representatives
    or agents, had with Auburn Sportsplex, LLC, its agents or representatives regarding Auburn Sportsplex, state for each communication:

    a.    the date of the communication

    b.    whether the communication was verbal or written;

    c.    the people or persons involved in said communication;

d.   the substance of said communication.

ANSWER:

Pursuant to Rule 33(c), I refer to correspondence between my counsel and the Defendants which are, presumably, in the custody, control and possession of the Defendants and/or their counsel.

In addition, over the course of the period covered by this action I have had numerous conversations with the Defendants, principally with John Natoli and Peter Natoli. While I cannot presently recollect specific dates, I can categorize the conversations as: (i) those prior to my August 2003 trip to Worcester; (ii) those during my visit in August, 2003; and (iii) those occurring after the August, 2003 visit. To the best of my recollection, the nature of those conversations were as follows:

Prior to August, 2003: In that I had a relationship with the individual
Defendants that extended more than 30 years, I had spoken with Peter Natoli sometime after May 20, 2001, the date on which I was seriously injured in a motor vehicle accident involving a motor vehicle striking me as a pedestrian. During the course of my hospital stay and rehabilitation, I spoke with Peter Natoli on a number of occasions. These conversations occurred over the phone.

As I recall, during the month of June 2003, within days of when I received in excess of $200,000 as a result of a settlement agreement I reached in connection with the car accident in which I was involved, I had a telephone conversation with Peter Natoli. I was told that Peter Natoli was building an indoor sports facility located in the Worcester area that he had started with Dennis Natoli and John Natoli. I was also told that in addition to the Natolis, there were two other persons who had made investments of $50,000 for an ownership interest. Peter Natoli told me that they were seeking additional investors and that I could have the same terms as the two other investors for a $50,000 investment.

Peter Natoli told me that they had prepared some written material that included a description of the sports facility, along with financial projections. I asked to see the material and was told it would be promptly sent to my home.

I told Peter Natoli that while I had access to some money due to the settlement, I needed to obtain a monthly return of at least $1,000 on any funds I would invest not later than 6 months after the investment. In response, Peter and John Natoli told me that I would

from the date of the demand of the return of the funds to the present; I have also been deprived of the use of the money I transferred from the date of the transfer to the present, the use of which would have conservatively generated a rate of return of 10% per annum. I have also been damaged economically by having to engage counsel, experts in accounting, court costs and miscellaneous expenses.

11.    State each and every fact which supports the allegation that the Defendants "have been engaged in conduct which tends to prejudicially affect the business purposes and standing of ASP"

ANSWER:

   To the best of my knowledge, by way of illustration, defendants have failed to maintain timely and accurate business records related to among other things, revenue generated, have failed to make timely filings of tax returns and required business certificates, have failed to provide minority owners with material information related to the contractual obligations of the business (for example, reports concerning the status of the business/ obligation to creditors), and regarding the management of the company.

12.    State each and every fact which supports the allegation that the Defendants have "wrongfully excluded and continue to wrongfully exclude Plaintiff from participation in the management of ASP".

ANSWER:

   By way of illustration, but not limitation, I was not provided with timely notice of meetings of the owners at which, apparently, corporate business was conducted. I was not provided with the information referenced in the answer to the preceding interrogatory.

13.    State each and every fact which supports the allegation that the Defendants "have, or are currently, engaged in discussions which a third party or parties concerning the sale of certain assets of ASP".

ANSWER:

   During the course of a telephone conversation with Peter Natoli, I was informed that an outside party had expressed an interest in acquiring an interest in the Sportsplex and that and  that I would get approximately $106,000 from the sale of the building and Sportsplex.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS DAY OF _April 25_____, 2006.

Plaintiff's Deposition
Exhibit # 5

EXHIBIT
Schuster
CARTIN REPORTING SERVICE
4-16-06

Peter, John & Dennis,                    April 16, 2004

This is a very unfortunate and unpleasant letter to have to write; but I have left you Peter numerious Phone Messages and have asked Dennis twice to have you call me to no avail.

As of today April 16, 2004 I have not recieved a shread of information or data concerning the Sportsplex. This is absoultly unacceptable and not fair.

When I became involved in this project, I only did so based on the friendship and trust I have in Peter. Originally I was considering investing $9,000.00 in the Sportsple, Based on circumstances that occured you needed more and this number doubled. At the time and since I stressed that I could go six months without seeing a return on monies but then would need a monthly return as I am disabled and would need it to live.

With all the different teams from various Sports playing in the Dome it should be easy to do $250,000.°° - $500,000.°° gross in photo Packages with at least a 60% net profit. There are many ways to get the Manufacturers to supply any needed equipment without a Cost Outlay.

I know my Personal finances are of no interest or Concern to you, but I am presently coming up very Short—January 21, 2004 was Six months. It is now 9 months. I had hoped to drive up to Orleans a few weeks ago and address some of this with you John, but 2 messages to your cell phone went unanswered.

I do not like how uncomfortable you are all making me feel and I must state again the reason this deal was done as relaxed as it was—only was because of my trust and friendship with Peter and Dennis and an almost 30 year relationship with John.

This issue must be resolved immediately, figure a way work something out, or I will invoke the refund clause.

Sincerely, Chris Schenk

561-649-8419
561-328-0959 Cell

1015 Olive Tree Circle
Greenacres Fl 33...

John Natoli Deposition
Transcript Pages:

39,40,54,57,58,63,75,76
83-85,109-112, 118,119,
121,138

1            IN THE UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

2                 CENTRAL DIVISION

3  CHRISTIAN SCHWENK,
       Plaintiff

4

  VS.                   C.A. NO. 05 CV 40071-FDS

5  AUBURN SPORTSPLEX, LLC,

6  DENNIS NATOLI, JOHN NATOLI
  and PETER NATOLI,

7       Defendants

8

9

10    DEPOSITION of JOHN V. NATOLI, taken at the

11  request of the plaintiff, pursuant to Rule 30 of

12  the Federal Rules of Civil Procedure, before

13  Michael Gruber, a notary public in and for the

14  Commonwealth of Massachusetts, on May 4, 2006,

15  commencing at 11:00 a.m., at the offices of

16  Pojani, Hurley, Ritter & Salvidio, P.C., 446 Main

17  Street, Worcester, Massachusetts.

18

19

20

21  A P P E A R A N C E S:

22  FOR THE PLAINTIFF:

23  DOUGLAS L. FOX, ESQ.
  SHUMWAY, GIGUERE & FOX, ESQS.

24  19 Cedar Street
  Worcester, Massachusetts 01609    ORIGINAL

1          A.        Correct.

2          Q.        Then I apologize. My question was

3    intended to ask you, what contributions did you

4    make at the time the LLC was established?

5          A.        The land.

6          Q.        That's the land where the SportsPlex

7    is located?

8          A.        Correct.

9          Q.        Who had the title to the land when it

10   was conveyed to the SportsPlex?

11         A.        Title to the land was to our trust,

12   One St. Mark Realty Trust.

13         Q.        When was that trust established?

14         A.        1996.

15         Q.        Who were the beneficiaries when it was

16   established?

17         A.        John Natoli, Peter Natoli, Dennis

18   Natoli, Alex Thomas, Paul Bernard.

19         Q.        Were the five of you all investors

20   that acquired this real estate?

21         A.        Correct.

22         Q.        For speculation?

23         A.        Correct.

24         Q.        Who was the trustee at the time?

1       A.      Trustees were Dennis Natoli and Peter
2   Natoli.

3       Q.      Does the trust still exist?

4       A.      Yes, it does.

5       Q.      Who are the trustees at this time?

6       A.      Same.

7       Q.      And the same beneficiaries?

8       A.      Same.

9       Q.      Was there any income realized by the
10  trust between the time it came into existence
11  until the time the property was conveyed to
12  Auburn SportsPlex?

13      A.      Yes. The trust always made money.

14      Q.      Were there other assets in the trust
15  besides this piece of property?

16      A.      Well, it was a whole piece of
17  property.

18      Q.      Okay. So only a portion was conveyed
19  to --

20      A.      Correct.

21      Q.      -- Auburn?

22              Was there rental income off the
23  property?

24      A.      Which property are you referring to?

1    there wasn't a loan at the -- for the trust. I

2    personally signed the loan for the money.

3        Q.    Can you think of any reason why Auburn

4    SportsPlex would be paying money to St. Mark

5    Trust since Auburn SportsPlex came into

6    existence?

7        A.    It might have paid on some monies that

8    we used from One St. Mark Street, okay, because

9    monies were put into One St. Mark Street Realty

10   Trust from our own personal, so instead of One

11   St. Mark writing checks to us that could be noted

12   as income, they would pay certain entities for

13   Auburn SportsPlex, whatever it was at that

14   particular time, which was probably, you know, a

15   couple of times.

16       Q.    I'm sorry, Mr. Natoli, I'm not sure I

17   understood your answer, and that's my fault. I'm

18   just having a hard time following this.

19            St. Mark Trust and Auburn Sports, LLC

20   are two separate entities, is that correct?

21       A.    Yes.

22       Q.    And the financial records of the trust

23   are maintained separately from the financial

24   records of Auburn SportsPlex.

1      A.      Yes.

2      Q.      When you say "we" --

3      A.      I'll give you one example real quick.

4  We had to put up -- the town made us put in

5  barriers up above, so that a car couldn't go over

6  the side and go down the hill. So it was on the

7  property of One St. Mark Street Realty Trust.

8  They paid for it, and we reimbursed them.

9      Q.      So this was a requirement that the

10 town was imposing on Auburn SportsPlex?

11     A.      Yes. It was actually -- I would say it

12 was imposing on One St. Mark Street Realty Trust,

13 but it was because of us, and being that all of

14 us are all the same, that's how we went about,

15 you know, making that improvement.

16     Q.      Who is all the same?

17     A.      My brothers and myself.

18     Q.      In 2004?

19     A.      Yeah.

20     Q.      Weren't there also --

21     A.      We're also owners of One St. Mark

22 Street Realty Trust and also owners of Auburn

23 SportsPlex. We thought as though -- you might not

24 think it's correct business ethics or a way to do

1    this, okay -- it was, again, just like Chris was

2    saying, this was amongst family and friends. We

3    took money from Peter to pay Paul.

4         Q.    Well, when you say "we're all the

5    same", the ownership of the trust is not the same

6    as the ownership of the LLC.

7         A.    The individuals that own shares in

8    both are the same.

9         Q.    Mr. Schwenk doesn't own shares in this

10   trust, does he?

11        A.    I didn't say Mr. Schwenk. I said my

12   brothers and myself.

13        Q.    Right, but Mr. Schwenk had an

14   ownership interest in the LLC.

15        A.    Mm-hmm.

16        Q.    As did Mr. Teixeira and Mr. Vail.

17        A.    I agree with you.

18        Q.    So to say there's a common ownership

19   between the two entities is not completely

20   accurate, is it?

21        A.    No, I said -- I think I said that my

22   brothers -- I know I said that my brothers and

23   myself. But the difference is that when we showed

24   losses at the SportsPlex I agree with you one

1      A.     I don't know what it is. If you want

2  to show me the financials --

3      Q.     Here's -- it was highlighted.

4      A.     So I can see.

5             (Handed to witness.)

6      A.     What you're seeing is a total, here in

7  July, October, November and December, of payments

8  of 6,500, one hundred, 10,000, and $13,000 back

9  to, okay, back to One St. Mark Street, because

10 One St. Mark Street lent Auburn SportsPlex this

11 money in order to keep operating.

12     Q.     This is which one, now?

13     A.     Jeez, weren't you listening?

14            MR. RITTER: Let's take a quick break.

15     A.     Yeah, I think I need a break because

16 you're getting on my nerves. You ask me to answer

17 a question. You don't listen. I answered it.

18     Q.     Take a break.

19            MR. RITTER: Can we have that marked?

20     A.     And I want a copy so I know what

21 you're talking about. Now I know what you're

22 talking about.

23            (Five-minute recess.)

24     Q.     Mr. Natoli, I'm going to ask the court

1          Q.    And you knew that, when you borrowed

2    the money from the North Brookfield Savings Bank,

3    that you had a requirement in the loan document

4    to maintain your principal operating account with

5    them?

6          A.    We knew?

7          Q.    Did you know that?

8          A.    No. That I had to?

9                (Handed to witness.)

10         A.    Oh, that's why then -- that's why

11   then --

12         Q.    Let me just ask you to read the

13   highlighted language in this document.

14         A.    Let me look at the document. I

15   probably didn't read this paragraph or all the

16   other documents that came, because it's that

17   thing.

18                It says, "The borrower shall maintain

19   with the bank its primary operating and deposit

20   accounts. At the option of the bank all loan

21   payments and fees will automatically be debited

22   to the borrower's primary. Operating account --"

23   same paragraph. "Operating account and all

24   advances will automatically be credited to the

1    borrower's primary operating account."

2            They knew that we -- only because

3    North Brookfield is a 45-minute drive to make a

4    deposit, and they knew we had to open up locally.

5        Q.    Did you maintain your main operating

6    account at North Brookfield Savings Bank?

7        A.    At that particular time, yes.

8        Q.    When did that end?

9        A.    I don't know. The operating account

10   still exists.

11       Q.    But is it your main operating account?

12       A.    No, it's not.

13       Q.    When did it stop being your main

14   operating account?

15       A.    I don't know.

16       Q.    Who would be the person who would best

17   be able to answer that question?

18       A.    I would have to research it.

19       Q.    That would be you?

20       A.    Yes.

21       Q.    I'm going to ask you to take a look at

22   what was marked Exhibit 1 in Mr. Schwenk's

23   deposition. Do you recognize that document?

24            (Handed to witness.)

1    we made room for the new ones to come in.

2        Q.    So, for 2003, 2004, there are no cash

3    receipt records?

4        A.    2003 was only a month and a half.

5        Q.    So, 2004, no?

6        A.    Cash receipts? Just deposit slips that

7    were made.

8        Q.    But not the receipts that you give to

9    the customer.

10        A.    No. No, we wouldn't keep them. If they

11    requested a receipt for what they had to pay cash

12    for we'd give it to them.

13        Q.    Right. I thought you said there was a

14    waiver --

15        A.    Everybody that participates.

16        Q.    So you would keep a copy of that,

17    wouldn't you?

18        A.    Yes.

19        Q.    And that would also reflect how much

20    cash they paid.

21        A.    No.

22        Q.    So that's a second --

23        A.    It was a liability waiver. Right.

24        Q.    So the receipt that they would get for

1    the cash --

2        A.    It's an actual receipt that says "cash

3    receipt", date, what it's for, and signed.

4        Q.    It's on a book that keeps a carbon

5    copy?

6        A.    No.

7        Q.    No copies?

8        A.    No.

9        Q.    Is that true for 2005 and 2006?

10       A.    Yes.

11       Q.    In your letter to Mr. Schwenk -- by

12   the way, did you expect Mr. Schwenk to rely on

13   the things that you were saying in this letter,

14   Exhibit 1?

15       A.    No, it was just me personally writing

16   to him to make him feel a little bit more

17   comfortable about his investment. That was it.

18       Q.    Well, why did you want him to feel

19   more comfortable?

20       A.    Okay, let's put what I want. No

21   offense, but I didn't want Chris Schwenk --

22       Q.    Go ahead.

23       A.    I had another investor.

24       Q.    Go right ahead.

1        A.      That's it.

2        Q.      Anything else you want to say?

3        A.      So when my brothers, you know,

4    convinced me to go into it I wanted him to feel

5    assured, as a friend and someone he's known for

6    most of his life, that this is going to be a good

7    investment. That's why I reflected it to One St.

8    Mark Realty Trust, because we're all friends and

9    it came out to be a real good investment.

10       Q.      I'm going to ask the court reporter to

11   read back my last question and your answer to it.

12   Just listen, please.

13               (Record read.)

14       Q.      Was your answer to my question

15   correct?

16       A.      Yes.

17       Q.      Do you wish to change it in any way?

18       A.      No.

19       Q.      In your letter you refer to, "This

20   investment is protected by real estate."

21       A.      Yes.

22       Q.      "And it should give you a return from

23   18 to 30 percent."

24       A.      Yes.

1    even.

2        Q.    Is it true that before Mr. Schwenk

3    made his investment, that the business was

4    operating at a loss?

5        A.    Yes.

6        Q.    In fact, there were several checks

7    that were written that came back for insufficient

8    funds?

9        A.    Could have been.

10        Q.    Whose responsibility was it to balance

11    the checkbook?

12        A.    Whose responsibility was it to balance

13    the checkbook?

14        Q.    Yes, sir.

15        A.    Any one of the partners.

16        Q.    Who was handling that responsibility

17    from the time the LLC was established to the time

18    Mr. Schwenk made his investment?

19        A.    I guess I was.

20        Q.    Were you balancing the checkbook every

21    month?

22        A.    Received a statement and gave it to

23    our accountant.

24        Q.    Mr. --

1          A.      Steve Richer.

2          Q.      So it was his responsibility to

3    balance the checkbook?

4          A.      No, it wasn't his responsibility to

5    balance the checkbook.

6          Q.      That was yours.

7          A.      And I would like to see what you're

8    talking about as far as when you refer that

9    several checks had bounced, I would like to see

10   what it is.

11         Q.      So it was your responsibility --

12         A.      Because I don't remember these.

13         Q.      Was it your responsibility to balance

14   the checkbook in that time period?

15         A.      To make -- well, to try -- to receive

16   the money to put in to cover whatever expenses,

17   but it was kind of difficult at certain times

18   because during construction there were so many

19   different things going on, okay, a check could

20   have been written out by Peter to pay a

21   contractor for something, and I wasn't aware of

22   it, and had to put money in there. But if you can

23   get more specific I'd appreciate it.

24         Q.      To date the only investors in the

1    business are the three Natoli brothers, Mr.

2    Schwenk, Mr. Teixeira and Mr. Vail?

3         A.    Yes.

4         Q.    Have Mr. Teixeira or Mr. Vail made any

5    requests to you to see the financial records?

6         A.    No.

7         Q.    Have they been asked to contribute

8    anything to make up shortfalls?

9         A.    No.

10        Q.    Why is that?

11        A.    We didn't ask anybody. We just made

12   the shortfalls and figured it would just pass

13   back.

14        Q.    Is there a record someplace of the

15   contributions you made to --

16        A.    Yes, deposit slips.

17        Q.    Is it in the form of a loan?

18        A.    No.

19        Q.    What is it?

20        A.    We just put money in to cover our

21   expenses and then, you know, pay ourselves back,

22   pay ourselves back.

23        Q.    So it was a loan?

24        A.    Yeah, it was a non-secured loan.

1      Q.      Is there an interest rate for the
2    loan?
3      A.      None.
4      Q.      Is there a promissory note?
5      A.      None.
6      Q.      Were there occasions that there would
7    be cash withdrawals from the LLC before Mr.
8    Schwenk made his investment?
9      A.      Could have been. I don't know what
10   you're referring to.
11     Q.      I'm looking at one for 25,000.
12     A.      Mm-hmm.
13     Q.      In March of '03.
14     A.      Okay.
15     Q.      Do you know what that was for?
16     A.      Is it listed in the bank as cash?
17     Q.      Yes.
18     A.      Okay, that could be a bank check.
19     Q.      To pay for?
20     A.      I don't know.
21     Q.      Actually, the precise amount is
22   $25,500, but it doesn't say to whom it's payable.
23     A.      I don't know. How -- well, is that
24   your records or is that the bank records? Is that

1    we want to sell.

2         Q.    Did you sign Exhibit 4?

3         A.    Exhibit 4?

4         Q.    In the Schwenk deposition.

5         A.    The only thing I signed was right next

6    to my signature.

7         Q.    What does that mean, right next to

8    your signature?

9         A.    Right there. That's my signature,

10   right next to my name.

11        Q.    Right next to your name.

12        A.    Yes.

13        Q.    So that is your signature?

14        A.    That is my signature, yes.

15        Q.    And then on Exhibit A?

16        A.    Yes.

17        Q.    You also signed that?

18        A.    Yes.

19        Q.    When did you sign it?

20        A.    Before I sent it down to Chris, which

21   was one or two days in June, just before he

22   received it on the twenty-third.

23        Q.    Where were you when you signed it?

24        A.    At the dome.

 1          Q.     Who was present?

 2          A.     My brothers and myself.

 3          Q.     Your two brothers witnessed you sign

 4     the document at the dome?

 5          A.     Yeah, all signed it and then we sent

 6     it down to Chris.

 7          Q.     And that was Peter and Dennis --

 8          A.     Yes, Peter and Dennis Natoli, right.

 9          Q.     -- were in your presence when you

10     signed it?

11          A.     Yes.

12          Q.     And they signed it in your presence?

13          A.     Yes.

14          Q.     Anyone else present --

15          A.     No.

16          Q.     -- when the three of you signed it?

17          A.     No.

18          Q.     Did you only sign one original?

19          A.     Yes.

20          Q.     Did you keep a copy of it?

21          A.     There was a copy. It got lost in the

22     flood with those records in the file.

23          Q.     So that copy would reflect a contract

24     signed by you and your two brothers, but --

1      A.    I got it from a Staples thing, for
2  just a general ownership. That's all.
3      Q.    That was you?
4      A.    Yeah.
5      Q.    You borrowed language --
6      A.    Yes.
7      Q.    --from a form that you found?
8      A.    Yes. Trying not to be overly
9  technical. That's all.
10      Q.    Did you have any conversation with Mr.
11  Schwenk, before you and your two brothers signed
12  this document, about his decision whether or not
13  to become an investor?
14      A.    Actually, I don't recall any
15  conversation. Most of the conversations were
16  between Peter and Chris, I think.
17      Q.    Did you make any promises or
18  representations --
19      A.    None.
20      Q.    -- to Mr. Schwenk other than the
21  letters that you sent to him?
22      A.    No.
23      Q.    He didn't call you up and ask you
24  questions about it?

1     Q.     With regard to the backhoe, Mr.

2   Teixeira and Mr. Vail, were they investors at

3   that time?

4     A.     Yes, I think they were.

5     Q.     Were they ever asked for their opinion

6   on whether or not to acquire the backhoe?

7     A.     No.

8     Q.     Why?

9     A.     Never got to it.

10    Q.     Either before or after the vote was

11  taken?

12    A.     They knew after the vote.

13    Q.     How did they know?

14    A.     Because they saw it helping the

15  construction of the building.

16    Q.     How would they know that it was owned

17  by the LLC, by just seeing it helping in the

18  construction?

19    A.     Because we told them.

20    Q.     Did you tell them there had been a

21  meeting of the stockholders on July 30 that they

22  hadn't been invited to?

23    A.     It had to be -- it was a quick meeting

24  in order to purchase it, because what happened

Peter Natoli Deposition
Transcript Pages:

11, 14, 68-72

---

Complaint of Accounting
Thomas
v.
Natoli, et al ( 03 E 0083 GC 1)

```
 1            IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2                  CENTRAL DIVISION

 3    CHRISTIAN SCHWENK,
           Plaintiff
 4
      VS.                    C.A. NO. 05 CV 40071-FDS
 5
      AUBURN SPORTSPLEX, LLC,
 6    DENNIS NATOLI, JOHN NATOLI
      and PETER NATOLI,
 7         Defendants

 8

 9

10       DEPOSITION of PETER NATOLI, taken at the

11    request of the plaintiff, pursuant to Rule 30 of

12    the Federal Rules of Civil Procedure, before

13    Michael Gruber, a notary public in and for the

14    Commonwealth of Massachusetts, on May 4, 2006,

15    commencing at 2:35 p.m., at the offices of

16    Pojani, Hurley, Ritter & Salvidio, P.C., 446 Main

17    Street, Worcester, Massachusetts.

18

19

20

21    A P P E A R A N C E S:

22    FOR THE PLAINTIFF:

23    DOUGLAS L. FOX, ESQ.
      SHUMWAY, GIGUERE & FOX, ESQS.
24    19 Cedar Street
      Worcester, Massachusetts 01609
```

ORIGINAL

1        A.    Yes.

2        Q.    You were here throughout the day when

3   your brother John testified?

4        A.    Yes.

5        Q.    And you heard all the things he said?

6        A.    Yes.

7        Q.    Is that correct?

8        A.    Yes.

9        Q.    When do you think it was that Mr.

10  Schwenk was first informed of this idea about the

11  SportsPlex?

12       A.    Chris had come to stay with me for a

13  little bit. He had a few problems back in New

14  Jersey financially. Unfortunately, things hadn't

15  gone too smoothly for him, and he came to live

16  with me for a little bit. And then, I'm not sure,

17  it was kind of a tight squeeze. It's just a small

18  living quarters between my wife and I and Chris,

19  and Chris thought it would probably be better if

20  he gave us a little privacy.

21            Then I didn't hear from him for a

22  while. And then he ended up -- I subsequently

23  found out from him that he ended up in Florida,

24  and he was in a car accident. He was hit by a

1   to become rich from it.

2        Q.    You knew that the settlement money

3   would be pretty much all that he would have to

4   support himself.

5        A.    Pretty much. He said he didn't know

6   when he was going to be able to go back to work.

7   Sounded like he had a pretty sizable settlement.

8        Q.    Did he tell you or share with you the

9   extent of his injuries?

10        A.    Yeah, he told me he was -- he was hurt

11   pretty bad. He was banged up pretty good. He

12   doesn't hide anything from me. We never did.

13        Q.    Did you have any discussion with him

14   as to whether or not this was an appropriate

15   investment for him, given his circumstances?

16        A.    Yeah, I thought that he would be able

17   to, you know, have some income coming in.

18        Q.    As opposed to, for example, a mutual

19   fund or treasury bills or --

20        A.    I don't know anything about mutual

21   funds or --

22        Q.    Real estate investments?

23        A.    -- or any investments like that.

24        Q.    You know about real estate

1      A.    I think it was just myself, Dennis and
2  John decided that we were going to sell some of
3  our -- our ownership to Chris.
4      Q.    Are there minutes of that meeting?
5      A.    There must be. I don't know. John
6  keeps the minutes.
7      Q.    John kept all the minutes?
8      A.    Yeah.
9      Q.    Is it your testimony that this Schwenk
10  Exhibit 4, the ownership purchase agreement, was
11  signed by you, Dennis and John together?
12      A.    Yes.
13      Q.    And mailed to Mr. Schwenk?
14      A.    Yes.
15      Q.    Did you see it when it came back?
16      A.    No.
17      Q.    Is your signature on Exhibit A of this
18  document?
19      A.    Yes.
20      Q.    It's on the line that's next to the
21  words "Peter Natoli"?
22      A.    Yes.
23      Q.    Is Dennis Natoli's signature on that
24  document?

```
 1        A.     Yes.

 2        Q.     Did he sign it for himself or did

 3   somebody sign his name for him?

 4        A.     I didn't see whether he signed it or

 5   not. I signed mine and went back to work.

 6        Q.     What about on page 2 of this

 7   agreement? Is that your signature on the second

 8   line?

 9        A.     Yes.

10        Q.     Did Dennis sign the document in your

11   presence?

12        A.     Not in my presence, no.

13        Q.     Did John?

14        A.     John sign his? Yeah.

15        Q.     In your presence?

16        A.     No. I signed it and went back to work.

17        Q.     Let me just see if I can visualize

18   this.

19        A.     Mm-hmm.

20        Q.     Where were you when somebody said it's

21   time to sign this contract?

22        A.     I was standing at the dome, getting

23   ready to pour a concrete floor. He said he was

24   getting ready to put it in the mail, sign where
```

1    my name is. So I did.

2        Q.    So, you were working at the

3    SportsPlex.

4        A.    Yes.

5        Q.    You got a phone call?

6        A.    No, he came down.

7        Q.    He came down. That's John?

8        A.    Yeah, and signed it on the little

9    reception area that we had, put it down there, he

10   said, "You need to sign here and here," so I did.

11       Q.    When it was presented to you was there

12   already somebody else's signatures on it?

13       A.    I don't know. I have no idea. I don't

14   remember.

15       Q.    So it might have been a blank or it

16   might have already been signed by somebody?

17       A.    Might have been signed already, might

18   have been blank. I don't know, we were all

19   getting together to sign it.

20       Q.    So then he came down. Was he by

21   himself?

22       A.    He came down first, and then Dennis

23   came down after he did.

24       Q.    When he came down you stopped what you

1    were doing, he showed you where to sign?

2        A.    Mm-hmm.

3        Q.    And you signed?

4        A.    Mm-hmm.

5        Q.    Then you went back to work.

6        A.    Yeah.

7        Q.    As of today you don't remember whether

8    there was anybody else's signature on either the

9    second or third page of this document when you

10   signed it.

11       A.    Well, we were the only three there, so

12   I don't remember anybody else signing it or

13   seeing anybody else's signature.

14       Q.    Okay.

15       A.    There could have been John's already

16   on there. I know Dennis came late.

17       Q.    I'm just asking you. You don't

18   remember.

19       A.    I don't remember.

20       Q.    So, you signed where you needed to

21   sign?

22       A.    Right.

23       Q.    Then you went back to doing what you

24   needed to do?

1    A.    Right.

2    Q.    You didn't pay any attention after

3    that?

4    A.    I was only 15 feet away. I saw what

5    happened.

6    Q.    You did.

7    A.    Yeah. Dennis came in, he signed it.

8    John went to the back of the thing to pick up the

9    envelope, put it all in the envelope, said he was

10    going to go to the post office.

11    Q.    So you only saw one person sign it.

12    A.    Actually see? I don't know, I may have

13    seen two, I may have seen both of them sign it,

14    or I may have seen just Dennis.

15    Q.    Are you sure you saw Dennis sign it?

16    A.    I'm not sure who I saw sign it. I know

17    they were both there. We had met there to sign

18    it.

19    Q.    All right.

20    A.    I assume everybody signed it, off he

21    went.

22    Q.    Am I going too fast for you, Mr.

23    Natoli?

24    A.    No.

```
 1                              Volume I
                            Pages 1 - 91
 2

 3              COMMONWEALTH OF MASSACHUSETTS
        WORCESTER, SS.        PROBATE & FAMILY COURT
 4                            DEPARTMENT OF THE TRIAL COURT

 5      ALEX THOMAS,                     )
                      Plaintiff          )
 6                                       )
            VS.                          )C.A.  NO.  03E0083GCI
 7                                       )
        PETER NATOLI, Trustee and DENNIS )
 8      NATOLI, Trustee of the ONE SAINT )
        MARK STREET REALTY TRUST,        )
 9                      Defendants       )

10

11          DEPOSITION OF PETER NATOLI, taken at the request

12      of the Plaintiff, pursuant to the applicable

13      provisions of the Massachusetts Rules of Civil

14      Procedure, before Karen G. Farragher, RPR and Notary

15      Public in and for the Commonwealth of Massachusetts,

16      on May 13, 2005, commencing at 10:00 a.m., having

17      been identified by the Notary Public through

18      satisfactory evidence of identity per Executive Order

19      No. 455 (03-13) at the offices of Bourgeois, Dresser,

20      White & Beard, Four Dix Street, Worcester,

21      Massachusetts.

22      _____
                    FOR THE RECORD
23              COURT REPORTING SERVICES
                    11 FISKE STREET
24         SHREWSBURY, MASSACHUSETTS   01545
                    (508) 845-1096
```

1    this instance, the sports plex was paid by One Saint

2    Mark for snowplowing --

3          A.      Right.

4          Q.      -- that you did?

5          A.      Yes.

6          Q.      With John's equipment or One Saint Mark

7    Street's equipment?

8          A.      Either or, yeah, whatever.

9          Q.      Well, why did the One Saint Mark Street

10   pay ASP for that service?

11         A.      Because it was probably done with the

12   backhoe which ASP leases from One Saint Mark Street.

13         Q.      Well, what kind of lease agreement

14   exists between ASP and One Saint Mark Street with

15   respect to this backhoe?

16         A.      One Saint Mark Street -- I mean, Auburn

17   Sports Plex makes the payments.

18         Q.      What brand and year and model is this

19   backhoe; do you know?

20         A.      Yeah, it's a John Deere.

21         Q.      I like it already.  What year?

22         A.      It's a great little machine.  I think

23   it's --

24         Q.      Ball park.

```
1        A.      Not sure.  2002.

2        Q.      It's a newer machine?

3        A.      It's a newer machine.

4        Q.      And One Saint Mark Street purchased

5   it --

6        A.      Yes.

7        Q.      -- or did they lease it; do you know?

8        A.      It's purchased.

9        Q.      They purchased it?

10        A.      Yes.

11        Q.      For how much?

12        A.      I don't recall at the moment.

13        Q.      Well, was it more than a hundred

14   thousand dollars?

15        A.      No, no, no.

16        Q.      Was it twenty-thousand dollars?

17        A.      No, it's like a thirty thousand dollar

18   machine.  It's a little one.

19        Q.      And it's owned by One Saint Mark Street.

20   Who made the decision to buy a backhoe?

21        A.      I did.

22        Q.      And why?

23        A.      We needed to have a -- we were having

24   pretty heavy snowstorms.  Seemed to be the trend and
```